**In the Matter of COMPUTERIZED STEEL FABRICATORS, INC., Debtor.**

**Arrangement No. 78 B 883.**

United States Bankruptcy Court, S.D. New York.

May 8, 1984.

Arutt, Nachamie, Benjamin, Lipkin & Kirschner, P.C., New York City, for debtor.

Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for Pension Fund for Iron Workers Local 455.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The reorganized Chapter XI debtor, Computerized Steel Fabricators, Inc. ("Computerized"), seeks to punish for contempt Pension Fund Iron Workers Local 455 ("Pension Fund" or "Fund") for the Pension Fund's post-confirmation efforts to collect from the debtor an alleged withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208, amending the Employee Retirement Income Security Act (ERISA), codified at 29 U.S.C. §§ 1001 et seq., which provides that if an employer ceases operations and terminates its employees, a withdrawal liability shall be incurred by the employer to the union involved. At the hearing regarding this issue, Computerized noted that it was not pressing the contempt aspect of its motion but rather urged that this court's previous order of confirmation discharged Computerized's obligations under its union contract, including the potential withdrawal liability.

## FACTS

On May 15, 1978, Computerized filed a voluntary petition for an arrangement under Chapter XI of the Bankruptcy Act of 1898 as amended. At that time, Computerized was a party to a collective bargaining contract with Shopmen's Local Union No. 455, International Association of Bridge Structural and Ornamental Iron Workers, AFL–CIO (Local 455). At no time during the course of the Chapter XI proceedings did Computerized seek to reject the collective bargaining agreement as an executory contract in accordance with the provisions of Section 313(1) of the Act. Indeed, a new collective bargaining agreement was executed by Computerized and Local 455 in April, 1980, effective from July 1, 1979 through the pendency of the Chapter XI proceedings. Moreover, at no time during the Chapter XI proceedings did the Fund or Local 455 make any claim for existing or prospective withdrawal liability under MPPAA. The only claim filed by the Fund in the Chapter XI case was for delinquent monthly contributions owed under the collective bargaining agreements. The Fund's proof of claim stated that the Fund reserved all claims which the Fund might have by reason of statutory mandates.

On November 23, 1981, Computerized was discharged pursuant to this court's order of confirmation with respect to the Chapter XI plan of arrangement. Computerized continued in operation as a going concern and continued its contributions to the Fund until June, 1982. Two months earlier, Computerized notified Local 455 by letter dated April 20, 1982, that it would not renew its contract with Local 455, which was to expire by its terms on June 30, 1982. In June, 1982, Computerized permanently ceased all operations.

By letter dated May 6, 1983, one and one-half years following confirmation of Computerized's plan of arrangement, the Pension Fund notified Computerized that

Computerized owed the Fund the sum of $201,342 as a withdrawal liability under MPPAA, which consisted of $33,800.79 for pre-petition debt; $142,137.77 for debtor-in-possession liability; and $25,403.44 for post-confirmation liability.

Paragraphs 3, 4, and 5 of the November 23, 1981 Order of Confirmation[1] provide that the arrangement shall be binding on all claims affected by the plan; that the debtor shall be discharged of all its unsecured debts; and that all creditors affected by the arrangement shall be enjoined from taking any action in connection with such discharged claims. Computerized maintains that as a result of this court's order of confirmation and discharge, there was no post-confirmation contract in existence between Computerized and Local 455 to which withdrawal liability could attach and that any such claim for pre-confirmation involvement was discharged.

## DISCUSSION

Computerized questions Pension Fund's assertion of a post-confirmation claim for withdrawal liability in accordance with the provisions of The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208, codified in scattered sections of 29 U.S.C. §§ 1001 et seq. The rationale for MPPAA is the assurance of pension rights for employees who might otherwise lose vested pension benefits when plans are terminated. In 1974, Congress enacted the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq. Under ERISA, the Pension Benefit Guaranty Corporation was created to provide insurance coverage for pension plan benefits in the event that a plan was terminated. However, multiemployer plans were not insured absolutely as were single employer plans. The participants in a terminated multiemployer plan might receive from the Pension Benefit Guaranty Corporation, at its discretion, the difference between the value of their guaranteed benefits and the value of the plan's assets on the date of termination. 29 U.S.C. § 1381(c)(2) (1974). If a plan terminated within five years of an employer's withdrawal from such plan and there were insufficient plan assets to provide benefits, the withdrawing employer became liable to the Pension Benefit Guaranty Corporation for the employer's proportionate share of the benefits paid, up to thirty percent of such employer's net worth. 29 U.S.C. §§ 1362, 1364. The problem of employer withdrawal was crucial in declining industries because withdrawals reduced the pension plan's contribution base and increased the financial burden on the remaining employers in order to fund past service liabilities. H.R.Rep. No. 869, 96th Cong., 2d Sess. 53–54 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 2918, 2922. One of the loopholes under ERISA was that an employer could withdraw from a plan and hope that the plan would survive for more than five years, in which event the employer would escape any withdrawal liability.

In order to close the five-year escape hatch for withdrawing employers, Congress enacted legislation in the Spring of 1979 which ultimately became the MPPAA on September 26, 1980, with retrospective effectiveness back to April 29, 1980. *See* 29 U.S.C. § 1461(e)(2). The retroactive date was used to prevent an employer from withdrawing from a plan un-

---

1. Paragraphs 3, 4 and 5 of the Order of Confirmation provide:

3. The arrangement and its provisions shall be binding upon the Debtor and all creditors of the Debtor whether or not they have accepted said Arrangement or have filed their claims or are affected by said Arrangement, and whether or not their claims have been scheduled or allowed and are allowable.

4. The Debtor herein, by the confirmation of the proposed Arrangement, be and it hereby is discharged of all its unsecured debts and liabilities provided for by the said Arrangement or in this Order, but excluding such debts as under Section 17 of the Bankruptcy Act are not dischargeable.

5. All creditors affected by the terms of the Arrangement be and they hereby are forever restrained and enjoined from taking any further action or proceeding in connection with their said claims, except to enforce the consummation of the terms of the Arrangement as confirmed herein.

der the lenient rules then current. 123 Cong.Rec. 20,234 (1980) (statement of Senator Matsunaga). Under the 1980 amendments, an employer who withdraws from an ongoing multiemployer pension plan becomes absolutely liable on the date of withdrawal for a proportionate share of the plan's unfunded vested liability. *Textile Workers Pension Fund v. Standard & Finishing Co., Inc.*, 725 F.2d 843 (2d Cir. 1984). "No longer did such behavior [employer's withdrawal] give rise, as it had under ERISA, to a contingent liability payable to the PBGC." *Peick v. Pension Benefit Guaranty Corporation*, 539 F.Supp. 1025, 1033 (N.D.Ill.1982).

■ Pursuant to MPPAA, a complete withdrawal occurs when an employer

(1) permanently ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan.

29 U.S.C. § 1383(a). The liability of a withdrawing employer as calculated under MPPAA is expressed in 29 U.S.C. § 1391(b), which in general terms consists of multiplying the plan's aggregate unfunded vested liability by a fraction whose numerator is the sum of all contributions required to have been made by the withdrawing employer during the previous five years. The denominator is the sum of all contributions made by all employers during this same five-year period. In view of the fact that Computerized ceased all covered operations under the plan in June, 1982, it is deemed to have effected a complete withdrawal from a multiemployer plan covered under MPPAA at that time. Hence, the withdrawal liability claimed by the Pension Fund in the instant case implicates Computerized's aggregate contributions for the plan years 1978 through 1982, notwithstanding that Computerized's Chapter XI plan of arrangement was confirmed on November 23, 1981.

## DOES THE UNION CONTRACT SURVIVE CONFIRMATION?

■ Computerized's contract with Local 455 was not rejected during the Chapter XI case. Instead, a new collective bargaining agreement was executed in 1980 which was to continue until June 30, 1982. This contract was never rejected by the debtor before the entry of the order of confirmation on November 23, 1981. Computerized maintains that by reason of the confirmation order and the discharge granted under Section 371 of the Act,[2] its contractual liability to Local 455 and the Pension Fund was extinguished. However, this position misses the point that an executory contract may be rejected in a Chapter XI case under Section 313(1) only by affirmative action and that unless it is so rejected, the contract continues in effect. *See Federal's Inc. v. Edmonton Investment Co.*, 404 F.Supp. 68, 71 (E.D.Mich.1975), *aff'd*, 555 F.2d 577 (6th Cir.1977); 8 Collier on Bankruptcy ¶ 3.15[6], at 204 (J. Moore 14th ed. 1978). Thus, the non-debtor party to such a contract does not have a provable claim because such party's claim does not arise under the Act until the contract has been rejected. *In re Greenpoint Metallic Bed Co., Inc.*, 113 F.2d 881, 883–84 (2d Cir. 1940); *Mohonk Realty Corp. v. Wise Shoe Stores, Inc.*, 111 F.2d 287, 290 (2d Cir. 1940); Collier on Bankruptcy, *supra*, ¶ 3.15[10], at 208. Accordingly there can be no discharge or extinguishment of the Pension Fund's claim by the order of confirmation because the Pension Fund did not have a provable claim while the union contract continued during the Chapter XI case and while the debtor continued to make contributions in accordance with MPPAA.

## WHEN DOES WITHDRAWAL LIABILITY ARISE?

■ Pursuant to 29 U.S.C. § 1383(e), "the date of a complete withdrawal is the date of the cessation of the obligation to

**2.** Sec. 371. The confirmation of an arrangement shall discharge a debtor from all his unsecured debts and liabilities provided for by the arrangement, except as provided in the arrangement or the order confirming the arrangement, but excluding such debts as, under section 17 of this Act, are not dischargeable.

contribute or the cessation of covered operations." Thus, Computerized's complete withdrawal from the multiemployer plan occurred in June, 1982, when it notified Local 455 that it did not intend to renew the union contract that terminated on June 30, 1982 and when it ceased all covered operations under the plan. This event occurred more than one and one-half years following confirmation. Manifestly, post-confirmation claims are not affected by the discharge. However, as stated in *In re Kessler*, 23 B.R. 722, 725 (Bkrtcy.S.D.N.Y. 1982), "the calculation of withdrawal liability, though triggered post-petition, is based ... on pre-petition factors."

 Computerized is disturbed by the fact that its post-confirmation liability embraces financial data with respect to its pre-petition and pre-confirmation status. Because MPPAA authorized a recovery for a post-confirmation liability calculated upon pre-petition and pre-confirmation factors, Computerized argues that such statutory liability clashes with the paramount discharge provisions of the Bankruptcy Act. For this proposition, Computerized relies upon *NLRB v. Bildisco*, — U.S. —, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), where the Supreme Court ruled that the authority of the Bankruptcy Court to permit the rejection of executory union contracts was superior to the enforcement of collective bargaining agreements under the National Labor Relations Act. However, there is no perceived tension between MPPAA and the Bankruptcy Act. Computerized's post-confirmation withdrawal liability under MPPAA was neither provable nor dischargeable under the Bankruptcy Act. Hence, Computerized's discharge with respect to its pre-confirmation unsecured claims pursuant to Section 371 of the Bankruptcy Act did not affect its post-confirmation withdrawal liability. Merely because the calculations of amounts in arriving at such liability include pre-petition and pre-confirmation factors does not mean that such liability should be regarded as having accrued either during a pre-petition or a pre-confirmation period. *See Wyle v. Pacific Maritime Association (In re Pacific*

*Far East Line, Inc.)*, 713 F.2d 476, 478 (9th Cir.1983); *In re Kessler*, 23 B.R. at 725. The entire liability was triggered when Computerized completely withdrew from the multiemployer plan in June, 1982.

## CONSTITUTIONALITY OF THE MPPAA's APPLICABILITY TO THE UNION CONTRACT

 Computerized maintains that its liability under MPPAA violates due process because MPPAA was not enacted until after Computerized entered into its multiemployer contract with Local 455. However, as previously noted, MPPAA was enacted in 1980 to close a loophole that existed under ERISA where withdrawal liability was not imposed upon an employer who withdrew from a multiemployer plan if the plan survived more than five years after such withdrawal. MPPAA simply continued the potential liability that existed during the five year period, but calculated the measure of such liability based upon the five year period immediately preceding the employer's withdrawal. 29 U.S.C. § 1391(b). Thus, MPPAA was in effect when Computerized withdrew from the plan so that Computerized was bound by the known consequences attending such withdrawal. A somewhat harsher situation occurred in *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843 (2d Cir.1984), where two employers withdrew from multiemployer plans during the hiatus period between September 26, 1980, when President Carter signed MPPAA into law, and the earlier effective date of April 29, 1980, as expressed in the bill itself. The Second Circuit Court of Appeals sustained the constitutionality of the retroactive application of MPPAA in the context of the four factors previously considered in connection with ERISA's single employer plan termination in *Nachman Corp. v. PBGC*, 592 F.2d 947 (7th Cir.1979), *aff'd on other grounds*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), namely (1) the reliance interests of the parties affected; (2) whether the impairment of the private interest is effected in an area previ-

ously subjected to regulatory control; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. In discussing the first factor, Circuit Judge Cardamone said:

> While the MPPAA had not been passed at the time both of these employers ceased operations, its existence—together with its retrospective withdrawal liability provision—was a matter of public knowledge.

725 F.2d at 850. Unlike the employers in the *Textile Workers Pension Fund* case who withdrew from a multiemployer fund before MPPAA was signed into law, Computerized withdrew from the plan when MPPAA was already in effect as an amendment to ERISA. Computerized may not now be heard to say that it was free to withdraw from the Multiemployer plan at any time without triggering a withdrawal liability simply because MPPAA had not been enacted when it entered into its contract with Local 455. The withdrawal liability of ERISA had been in effect since 1974. MPPAA merely modified ERISA so as to create mandatory rather than contingent liability. MPPAA simply requires a withdrawing employer to pay its agreed upon share of the already vested, but not funded, liabilities. The application of MPPAA to Computerized's then existing contract with Local 455 is neither retroactive nor unconstitutional. *Cf. Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d at 849–54.

### CONCLUSIONS OF LAW

1. Computerized's agreement with Local 455 was not rejected during the Chapter XI case and continued in effect until its expiration on June 30, 1982.

2. Computerized's withdrawal liability under MPPAA arose in June, 1982, when it permanently ceased all covered operations under the multiemployer plan required under its agreement with Local 455.

3. The Pension Fund's post-confirmation claim arising out of Computerized's withdrawal liability under MPPAA was neither provable in the Chapter XI case nor was it discharged when the order of confirmation was entered on November 23, 1981.

4. The applicability of the MPPAA to Computerized's contract with Local 455 is neither retroactive nor unconstitutional.

■ 5. Computerized's application to hold The Pension Fund in contempt for attempting to collect Computerized's post-confirmation withdrawal liability under MPPAA is denied.

SETTLE ORDER on notice.