In re UNITED DEPARTMENT
STORES, INC., Debtor.

In re HUGHES & HATCHER,
INC., Debtor.

In re OUTLET DEPARTMENT
STORES, INC., Debtor.

In re S.P. DUNHAM & CO.,
INC., Debtor.

In re ROTHSCHILD
BROTHERS, Debtor.

Bankruptcy Nos. 82 B 10151 (EJR)–82
B 10153 (EJR), 82 B 10155 (EJR) and
82 B 10156 (EJR).

United States Bankruptcy Court,
S.D. New York.

May 8, 1985.

Weil, Gotshal & Manges, New York City,
for debtors in possession.

Booth, Marcus & Pierce, New York City,
for claimant-respondent Amalgamated Ins.
Fund.

Teitelbaum & Gamberg, New York City,
trustee of Outlet Dept. Stores, Inc.

Paul, Weiss, Rifkind, Wharton & Garri-
son, New York City, for Official Creditors
Committees of S.P. Dunham & Co., Inc.,
and Rothschild Bros.

BURTON R. LIFLAND, Bankruptcy
Judge.

In the present applications, United De-
partment Stores, Inc., Hughes & Hatcher,
Inc., ("H & H") S.P. Dunham & Co. and
Rothschild Brothers, as debtors in posses-
sion, and the Trustee for Outlet Depart-
ment Stores, Inc. ("Outlet") (collectively
the "Debtors") seek to have the withdrawal
liability claims of the Amalgamated Insur-
ance Fund ("Fund") reclassified as a nonp-
riority, pre-petition unsecured claims. For
the following reasons, the Debtors' motions
are granted.

I. *Factual Background*

On January 25, 1982, the Debtors each
filed chapter 11 petitions under the Bank-
ruptcy Reform Act of 1978 ("the Code").
The chapter 11 case of Outlet was convert-
ed to a chapter 7 case on January 31, 1983,
and on February 25, 1983 a trustee was
appointed.

Prior to the commencement of their
cases, H & H and Outlet were parties to
collective bargaining agreements with the
Amalgamated Clothing and Textile Work-
ers Union. Pursuant to these agreements
H & H and Outlet were required to make
employee pension contributions to the
Fund, a multiemployer benefit plan for em-
ployees. A multiemployer plan is defined
as a plan to which more than one employer

is required to contribute, which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and which satisfies such other requirements as the Secretary of Labor may prescribe by regulation. *See* 29 U.S.C. § 1301(a)(3) (Supp. V 1981).

Subsequent to the filing date, both Outlet and H & H continued to make payments to the Fund at the rates provided for in their respective collective bargaining agreements. The parties have stipulated that payments were made to the Fund post-petition to avoid labor conflict.

On May 18, 1982, the Fund filed a general unsecured claim for withdrawal liability against each of the debtors herein in the amount of $2,353,816.21. On or about April 28, 1983, after H & H and Outlet had ceased doing business, the Fund filed an administrative claim against each of the debtors' estates in the amount of $2,231,-395.54,[1] asserting that these claims were entitled to first priority payment as expenses of administration under Sections 503(b)(1)(A) and 507(a)(3)(A) of the Code.

The Debtors have moved this Court for an order reclassifying these claims as nonpriority, pre-petition unsecured claims on the ground that the Debtors' withdrawal liability is not an actual, necessary cost or expense of preserving the estate and does not relate to services rendered after the commencement of the case. (*See* section 503(b)(1)(A), *supra.*) Rather, the Debtors contend that the withdrawal liability imposed by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1001–1461 (1976 & Supp. V 1981) ("MPPAA") and the collective bargaining agreements is based upon pre-petition factors, and that the Fund, not the estate, is the recipient of the benefits flowing from the Debtors' continued participation in the pension plan after they filed their chapter 11 petitions.

Outlet's chapter 7 Trustee asserted an additional ground for reclassifying the Fund's claim. The chapter 7 Trustee stated that her failure to assume the collective bargaining agreement within 60 days of the conversion of the case to a chapter 7 resulted in the contract being deemed rejected pre-petition pursuant to Code § 365(d)(1) and (g)(1).[2] The chapter 7 Trustee appropriately notes that as a pre-petition claim for damages the Fund's claim, to the extent that it is inextricably linked to the rejected collective bargaining agreement, may only be classified as a general, unsecured claim.

The Fund opposes these motions on several grounds. First, the Fund asserts that under the terms of the Employee Retirement Income Security Act, 29 U.S.C. § 1001–1381 (1976) ("ERISA"), withdrawal liability arises when an employer completely withdraws from a multiemployer plan by permanently ceasing all covered operations, as in the case at bar; or by permanently ceasing to have an obligation to contribute under the plan. Thus, urges the Fund, because the Debtors' obligation to pay the amount of withdrawal liability crystalized post-petition when they ceased all covered operations, the obligation should be classified as a first priority administrative expense. According to the Fund, while pre-petition employee services is a factor used to compute the amount of liability, the Debtors' obligation to pay this amount did not accrue until after they actually withdrew from the plan, a post-petition event.

Second, the Fund asserts that the withdrawal liability was in fact an actual and necessary expense of preserving the Debtors' estates because the Debtors accepted the benefits of continued employee services by failing to reject the collective bargaining agreements which mandated plan participation. The Fund did not address the Outlet Trustee's assertion that its collective bargaining agreement, which provides for

---

**1.** On or about November 21, 1983, the Fund filed amended administrative priority claims against each of the debtors herein in the amount of $2,163,955.78.

**2.** *See* note 4, *infra.*

the pension fund obligations, is deemed by the Code to have been rejected pre-petition and that therefore its claim for withdrawal liability must be classified as a pre-petition claim.

The issue before this Court is whether a claim for withdrawal liability based on a post-petition withdrawal event is to be considered an actual, necessary cost and expense of preserving the estate thereby entitling the claim to be classified as an administrative priority expense under §§ 503 and 507. It should be noted at the outset that a withdrawal liability claim does not fall neatly into any of the fully described categories in Code § 503, administrative expense claims, or in Code § 507, priorities. By insisting that the Court characterize its claim as one entitled to a first priority expense of administration, the Fund is attempting to squeeze its claim into the scheme envisioned by Congress when it drafted these Code sections. However, after analyzing the legislative history of the Code, it is clear that Congress did not intend an entity such as the Fund to be a beneficiary of the priority scheme.

## II. *Discussion of Law*

### A. *ERISA As Amended by MPPAA*

In 1974 Congress enacted ERISA to provide comprehensive regulation for private pension plans. In addition to prescribing standards for the funding, management and benefit provisions of private pension plans, ERISA established a system of pension benefit insurance. *See* 1 *Legislative History of the Employee Retirement Income Security Act of 1974* (1976) 212–214 (statement of Sen. Bentsen).

Title IV of ERISA created the Pension Benefit Guarantee Corporation ("PBGC") and required it to administer an insurance program that would cover the payment of certain guaranteed pension benefits to participants in a terminated plan. *See* 29 U.S.C. § 1302(a) (1976). The PBGC's obligation to pay guaranteed benefits in a multiemployer plan was not to become mandatory until January, 1978. *See* 29 U.S.C. § 1381(c)(1) (1976).

During the interim period between ERISA's enactment and January 1, 1978, the PBGC was required to determine whether to pay benefits upon the termination of a multiemployer plan on a case-by-case basis. *Id.* § 1381(c)(2). Where the PBGC determined to pay benefits, employers who had contributed to the plan during the five years prior to its termination were liable to the PBGC in amounts proportional to their shares of the plan's contributions during that period. *Id.* § 1364. Thus, prior to the date when guaranteed payment of benefits by the PBGC became mandatory, an employer's liability to pay was contingent upon whether the plan survived for the next five years and whether the PBGC decided to pay the guaranteed benefits.

Out of concern that the implementation of mandatory guarantees for multiemployer plans might encourage some large multiemployer plans to terminate, leaving PBGC with enormous claims that might exceed its assets, the MPPAA was signed into law on September 26, 1980. Among other things, the MPPAA requires an employer that withdraws from a multiemployer pension plan to continue to fund its share of the plan's liabilities. Congress believed that the imposition of this liability would safeguard a plan's stability. *See Hearings on the Multiemployer Pension Plan Amendments Act of 1979 before the Task Force on Welfare and Pension Plans of the Subcomm. on Labor-Management Relations of the (House) Comm. on Education and Labor,* 96th Cong., 1st Sess. 1149, 1158 *et seq.* (1980).

### B. *Priorities Under the Bankruptcy Code*

Code § 507 assigns priorities to certain kinds of claims. Creditors holding so-called priority claims are entitled to be paid in full before the debtor's estate is distributed to his other, nonpriority creditors. 3 *Collier on Bankruptcy* ¶ 507.02 at 507–12.9 (15th ed. 1981) ("Collier"). First priority is given to allowed administrative expense claims by Code § 507(a)(1). To de-

termine when a claim constitutes an administrative expense, reference must be had to Code § 503(b). The Fund in this case, searching to intrude itself into a narrow priority niche, seeks to have its claim classified under Code § 503(b)(1)(A). That section provides that a claim for "the actual, necessary costs and expenses of preserving the estate, including wages [and] salaries ... for services rendered after the commencement of the case" is allowed as an administrative expense. *Id.* The *Collier* treatise declares that "the priority provisions determined by Congress as a matter of policy are a hard and fast inexorable classification of claims against an estate and the order in which such claims are to be paid. This order of priorities may not be varied." 3 *Collier* ¶ 503.03 at 503–10–11. Based upon the principle of equality of distribution, "[i]f one claimant is to be preferred over others, the purpose should be clear from the statute." *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir.1976) (citing *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)).

Withdrawal liability payments represent an employer's pro rata share of the unfunded vested benefits of a multiemployer pension plan. 29 U.S.C. § 1381. This liability is imposed to insure that a pension plan remains solvent when a participating employer ceases to do business. *In re Kessler,* 23 B.R. 722, 725 (Bankr.S.D.N.Y. 1982). While claims for contributions to employee benefit plans keyed to discrete employee services are granted a fourth priority under section 507(a)(4) of the Code, "[n]othing in MPPA[A] establishes any priority for withdrawal liability claims in bankruptcy rehabilitation proceedings...." *In re Goldblatt Bros., Inc.,* No. 81 B 7075, slip op. at 3 (Bankr.N.D.Ill. Nov. 12, 1982) (claims for withdrawal liability brought by fund that embraced nondebtor entities held to be general unsecured claims).

Although in the instant case the Fund claims that the amount of withdrawal liability owed is based on factors other than pre-petition factors, and that the employees rendered some post-petition services to the debtor to the enhancement of the estate, these arguments do not persuade this Court to ignore the priority system established by the Code and reinforced by recent caselaw, *see Goldblatt,* slip op. at 4, and the precedent set by *Kessler.* Indeed, the Fund's attorney argued at the hearing of these motions that the collective bargaining agreements involved in *Kessler* were identical to those involved herein. Furthermore, the reliance by the Fund upon the rendition of services by the Debtors' employees post-petition is misplaced. The employees were either compensated or hold individual claims.

An analysis of the relevant caselaw reveals that withdrawal liability claims are not automatically treated as first priority administration claims for essentially the following ground. Although the triggering event (cessation of the debtor's business or employer's withdrawal from the plan) occurred post-petition, no corresponding post-petition benefit was found to have accrued to the estate. *See Goldblatt,* slip op. at 5. The *Kessler* court declared that "claims for an allowance as administrative expenses are to be judged by the actual value received by the estate; thus, a claim which merely has the potential for value upon the happening of other events may not be allowed as an administrative expense." 23 B.R. at 724 (citing *In re Rhymes, Inc.,* 14 B.R. 807 (Bankr.D.Conn.1981)).[3]

In a nonbankruptcy context, the triggering event might suffice to warrant the imposition of withdrawal liability on an employer. The Bankruptcy Code, however, requires more. Withdrawal liability is "an obligation of the debtor ... pursuant to the MPPA[A]," *Kessler,* 23 B.R. at 726, and the amount of liability is not affected by the

---

**3.** The debtor's termination of its employees was not viewed as actual value received by the estate. *Kessler,* 23 B.R. at 725. The *Kessler* court's decision also considered but apparently did not view as controlling the facts that with-

drawal liability was based on pre-petition factors and that withdrawal liability payments were not made directly to the employees. *Id.* at 724–26.

filing of a petition. *Goldblatt,* slip. op. at 5. Thus, in a bankruptcy context, affording administrative expense status to a claim for withdrawal liability would have the undesirable effect of benefitting other employer-participants in the plan who are not creditors of the debtor ahead of the debtor's bona fide creditors. This is because "the liability is not a direct payment to an employee for his post-petition services," but rather a payment to a fund, and thus "is not entitled to administrative status." *Kessler,* 23 B.R. at 726.

Applying the reasoning just enumerated to the instant case, the Debtors' employment of their employees cannot be said to represent a contribution on the part of the Fund toward preserving the estate. That the Debtors' employees would benefit from the Debtors' payment of the Fund's claim is not determinative, since the employees worked post-petition primarily for their own benefit rather than for that of the estate. Similarly, as noted in *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104 (Bankr. S.D.N.Y.1982), "where a creditor incurs expenses primarily in its own interest, this creditor is not entitled to a priority administrative expense claim." Furthermore, "courts analyze the impact of these expenses to insure that the expenses did in fact confer actual value on the estate as a whole." *O.P.M.,* 23 B.R. at 121. As the court noted in *Goldblatt,* "these employees worked for the debtor and received wages and benefits. [Debtors'] employment of these [employees] cannot be said to be the [union's] contribution to preserving the debtor's estate. Each [employee] worked for his own interest." *Goldblatt,* slip op. at 5.

Finally, the Fund's argument in both *Kessler* and the instant case that withdrawal liability is similar to severance pay in that both represent post-petition compensation is unpersuasive, and distinguishable from the case of *Straus-Duparquet, Inc. v. Local Union Number 3, Int'l Brotherhood of Elec. Workers,* 386 F.2d 649 (2d Cir. 1967). In *Straus-Duparquet,* the Second Circuit held that claims for severance pay are entitled to priority as administrative expenses in their entirety, while claims for vacation pay receive a first priority only to the extent the vacation pay accrued post-petition. The *Straus-Duparquet* court noted that vacation pay is not due until "the period of eligibility is served," *id.* at 651, and thereafter, whenever employment is terminated. The *Kessler* court characterized severance pay as "direct compensation to an employee" for post-petition services performed prior to the employee's termination. *Id.* at 726. Severance pay is accorded a third priority under the Code because it represents the employee's post-petition contribution to the preservation of the estate.

Withdrawal liability, in contrast, is not direct compensation to any employee, nor is it direct compensation for the termination of the employment relationship. Rather, it "is an obligation of the debtor ... pursuant to the MPPA[A]," to a designated group of beneficiaries, some of which have absolutely no connection to the bankruptcy. *Kessler,* 23 B.R. at 726. Thus, as the court in *Kessler* continued: "[W]ithdrawal liability, unlike severance pay, is not entitled to administrative status." *Id.*[4]

---

4. Code § 365(d)(1) provides: "In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract ... within 60 days after the order for relief ... then such contract ... is deemed rejected." Code § 365(g)(1) provides that "the rejection of an executory contract ... of the debtor constitutes a breach of such contract ... if such contract ... has not been assumed under this section ... immediately before the date of the filing of the petition." Thus when the Fund's withdrawal liability claim against Outlet is analyzed in the context of a deemed rejection of the underlying collective bargaining agreement under § 365, or in the context of classification of claims under Code §§ 503 and 507, the Fund's linkage to the rejected collective bargaining agreement mandates its classification as a pre-petition claim. Congress did not specifically carve the Fund out for exceptional treatment. See also the holding in *In re McFarlin's, Inc.,* 46 B.R. 88 (Bankr.W.D. N.Y.1985) (in a chapter 11 context, a confirmation order providing for rejection of a collective bargaining agreement results in the application of § 365(g) and the treatment of the withdrawal liability claim as a general unsecured claim).

Lest there be any doubt remaining as to the proper classification of a claim for withdrawal liability, the court in *In re Pulaski Highway Express, Inc.*, 41 B.R. 305 (Bankr.M.D.Tenn.1984) noted:

Congressional balancing of the interests of pension plans and the rights of debtors and creditors in bankruptcy is ... evidenced by the treatment of ERISA claims in the Bankruptcy Code. Although withdrawal liability was established as a significant safeguard against the collapse of pension plans, *see In re Kessler*, 23 B.R. 722–725 (Bankr.S.D.N.Y.1982), Congress did not include withdrawal liability as a special class of claims entitled to priority under the Bankruptcy Code and withdrawal liability is treated as an ordinary unsecured claim. *In re Granada Wines, Inc.*, 26 B.R. 131, 134 (Bankr.D.Mass.1983).

*Id.* at 311.

In conclusion, for the reasons and authorities detailed in this opinion,[5] the Fund's claim for withdrawal liability may not be treated as an administrative expense and the Debtors' motions to reclassify this claim as a general unsecured claim are granted.

It is SO ORDERED.

---

**5.** A recent case called to this Court's attention post-argument, *In re Computerized Steel Fabricators, Inc.*, 40 B.R. 344 (Bankr.S.D.N.Y.1984), is inapplicable to the case at bar. In *Computerized,* the company withdrew from a multiemployer pension plan nearly seven months after its reorganization plan was confirmed by the Bankruptcy Court under Chapter XI of the Bankruptcy Act. Thereupon, the Pension Fund sought to collect $201,342.00 from the company for its alleged withdrawal liability. The former Debtor, believing it had a Title 11 remedy, commenced an action in the Bankruptcy Court to hold the Pension Fund in contempt. The Bankruptcy Court denied the contempt motion, holding that the Debtor's withdrawal liability was neither provable in the now concluded Chapter XI case nor discharged by the order of confirmation. It appears therefore that because the withdrawal liability was not triggered until post-confirmation, the Fund's potential claim passed through the reorganization unaddressed and unaffected. Thus, the confirmation process had no effect on the post-confirmation event of withdrawal. The *Computerized* court did not have before it the issue of whether a post-petition but pre-confirmation withdrawal liability claim should be characterized as an administrative expense or a general unsecured claim under the Code.