In re PULASKI HIGHWAY
EXPRESS, INC., Debtor.

Bankruptcy No. 382–00465.

United States Bankruptcy Court,
M.D. Tennessee.

Jan. 9, 1986.

Greg Nelson, Dept. of Justice, Washington, D.C., for U.S.

R. Jan Jennings, Nashville, Tenn., for Central States Pension Fund.

Paul K. Bramlett, Nashville, Tenn., for J.T. Foster.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issue presented is whether a multiemployer pension plan's withdrawal liability claim is entitled to administrative expense priority. On peculiar facts and for the reasons stated below, the withdrawal liability claim must be apportioned between pre- and post-petition liability. The post-petition portion of the claim, when ultimately fixed in amount, may be entitled to administrative expense priority, in whole or in part.

The following constitute findings of fact and conclusions of law. Bankruptcy Rule

7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B) (1985).

## I.

Central States Southeast and Southwest Areas Pension Fund ("Central States") is the administrator of a multiemployer pension plan. Pulaski Highway Express ("PHE") was a party to that plan pursuant to its collective bargaining agreement.[1] On February 17, 1982, PHE filed for Chapter 11 relief. PHE ceased all business operations on March 26, 1982. Five days later its collective bargaining agreement expired by its terms without renewal.

On June 23, 1982 this court approved a plan of liquidation which included the following provision:

> Class 2: All necessary and actual expenses and costs incurred by the Debtor-in-Possession in preserving the estate since the date of filing of the petition, February 17, 1982, including rent, wages and salaries for services rendered after the commencement of the case.

PLAN OF LIQUIDATION, May 7, 1982, p. 2. Class 2 was described in PHE's disclosure statements as follows:

> *Class 2. Administrative Claims.* All necessary and actual costs and expenses of administration incurred by the debtor-in-possession since the date of the filing of the petition in preserving the estate and winding down of the business, including rent for premises, utilities and salaries for necessary personnel.

MODIFIED DISCLOSURE STATEMENT, May 23, 1982, p. 10; MODIFIED DISCLOSURE STATEMENT, May 13, 1982, p. 8; DISCLOSURE STATEMENT, May 7, 1982, p. 8.

---

**1.** A multiemployer pension plan is one:

(i) to which more than one employer is required to contribute,

(ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer ...

Employee Retirement Income Security Act of 1974 (ERISA) § 4201, 29 U.S.C. §§ 1001, *et seq.,*

§ 1381(a), Pub.L. No. 93–406, 88 Stat. 832 *as amended* by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208 (1980). In accordance with common usage, citations to ERISA are made to both the U.S. Code and the Act itself. Title I of the MPPAA added 29 U.S.C. §§ 1381, *et seq.* to ERISA. *See* MPPAA §§ 101 and 104(2) (1980).

Following confirmation, Central States amended its claim to assert status as a Class 2 administrative claimant for pension plan withdrawal liability in the amount of $820,382.24. The United States, which holds a claim for $221,938.81 in pre- and post-petition taxes and interest, and J.T. Foster ("Foster"), a principal of the debtor, have objected to administrative expense treatment for Central States' claim.[2]

## II.

Several courts have considered whether a claim for withdrawal liability is an administrative expense pursuant to 11 U.S.C. § 503(b) (1985), entitled to first priority of distribution pursuant to 11 U.S.C. § 507(a) (1985). They have all held that it is not. *See Amalgamated Insurance Fund v. William B. Kessler, Inc.*, 55 B.R. 735 (S.D. N.Y.1985) *aff'g*, 23 B.R. 722, 9 B.C.D. (CRR) 943 (Bankr.S.D.N.Y.1982); *In re United Department Stores, Inc.*, 49 B.R. 462 (Bankr.S.D.N.Y.1985); *In re McFar-*

*lin's, Inc.*, 46 B.R. 88 (Bankr.W.D.N.Y. 1985) (relying on 11 U.S.C. § 365(g)); *In re Cott Corp.*, 47 B.R. 487 (Bankr.D.Conn. 1984) (apportioning the claim between pre- and post-petition services, and granting first priority to the latter); *In re Blue Ribbon Delivery Service, Inc.*, 31 B.R. 292 (Bankr.W.D.Ky.1983); *In re Concrete Pipe Machinery Co.*, 28 B.R. 837, 10 B.C.D. 550 (CRR) 8 COLLIER BANKR.CAS.2d (MB) 294 (Bankr.N.D.Iowa 1983); *In re Goldblatt Brothers, Inc.*, No. 81–B–7075 slip op. (Bankr.N.D.Ill. Nov. 12, 1982). *See Granada Wines, Inc. v. New England Teamsters Pension Fund*, 748 F.2d 42 (1st Cir.1984), *aff'g*, unpublished district court judgment, *aff'g*, 26 B.R. 131 (Bankr.D.Mass.1983) (treating the entire claim as unsecured, without addressing the administrative priority issue). *But see Concrete Pipe*, 28 B.R. at 839, 841 (if the collective bargaining agreement had been assumed, withdrawal liability would be entitled to administrative expense treatment) (dicta).[3] This

---

**2.** Central States objects to the standing of Foster and the United States in this matter. It argues that because Foster will be subject to increased tax liability if he loses this motion, he should be precluded from bringing it. Though I am mindful of the Supreme Court's perplexity with standing issues, it is a novel conception that a party facing a prospective injury has no standing to be heard.

In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Court, *per* Justice Rehnquist stated:

We need not mince words when we say that the concept of Art III standing [sic] has not been defined with complete consistency in all of the various cases decided by this court ... nor ... that the concept cannot be reduced to a one-sentence or one-paragraph definition.

*Id.*, 454 U.S. at 475, 102 S.Ct. at 760, 70 L.Ed.2d at 711. Nevertheless, the Court noted:

[A]t an irreducible minimum, Art III [sic] requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury ..." and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision".

*Id.*, 454 U.S. at 472, 102 S.Ct. at 758, 70 L.Ed.2d at 709 (citations and footnotes omitted).

Both Foster and the United States are directly threatened with injury by the characterization of Central States' claim. If this court decides the instant motion against them, Central States'

claim will swallow the majority of the assets of PHE's estate, substantially reducing the share which the United States will receive on distribution. Foster may be personally liable to the United States for any deficiency in the distribution. Both injuries would be redressed by a decision on this motion against Central States.

Central States also raises the defenses of laches and estoppel. These defenses are inapplicable to the federal government. *Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 543, 5 L.Ed.2d 551, 562 (1961) (laches); *United States v. Weintraub*, 613 F.2d 612 (6th Cir.1979) ("the rule *nullum tempus occurrit regi* ... remains vital."), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–409, 37 S.Ct. 387, 391, 61 L.Ed. 791, 818 (1917) (estoppel). It is unnecessary to decide these issues as to Foster because both he and the United States have raised the same issues and arguments in their briefs.

**3.** *In re Concrete Pipe Machinery Co.*, 28 B.R. 837 (Bankr.N.D.Iowa 1983), held, pursuant to 11 U.S.C. § 365(g), that the post-petition rejection of a collective bargaining agreement produced withdrawal liability which would be treated as a general unsecured claim arising pre-petition. This is consistent with the decision of every court which has considered the treatment of withdrawal liability claims. Although, it did not attempt to allocate the liability between pre- and post-petition services, it does not appear that allocation was requested.

court cited with approval *Kessler* and *Granada Wines* in an earlier opinion in this case. *In re Pulaski Highway Express, Inc. v. Central States Southeast and Southwest Areas Health and Welfare and Pension Fund,* 41 B.R. 305, 12 B.C.D. (CRR) 34 (Bankr.M.D.Tenn.1984).

Administrative expenses are defined by § 503(b) of the Code:

> After notice and a hearing, there shall be allowed administrative expenses, ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b) (1985).

■ Administrative expenses are entitled to first priority of distribution. 11 U.S.C. § 507(a) (1985). Sections 503(b) and

507(a) grant priority status to encourage the provision of goods and services to the estate, and to compensate those who expend new resources attempting to rehabilitate the estate. *In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984). Ordinarily, administrative expense priority is only available for expenses incurred by, and beneficial to the bankruptcy estate. *Id.*[4] At a minimum the claim must be incurred in the regular administration of the bankruptcy estate. *See Jartran,* 732 F.2d at 584.

Withdrawal liability was designed by Congress to ensure that multiemployer pension plans have adequate funds to pay employee pensions. MPPAA § 3, 29 U.S.C. § 1001a(c) (1985).[5] It is defined as the amount of "unfunded vested benefits" allocable to the employer, subject to certain adjustments not relevant here. ERISA § 4201(b)(1), 29 U.S.C. § 1381(b)(1) (1985).[6]

---

The debtor had asserted that withdrawal liability would be an administrative expense to convince the court that its collective bargaining agreement should be rejected as unnecessarily burdensome. The collective bargaining agent did not argue contrary, asserting instead that the withdrawal liability was entitled to administrative priority in any event. The court's decision in favor of rejection listed a variety of factors, each of which, standing alone, was sufficient grounds for rejection. Its agreement with the debtor's position about the administrative status of withdrawal liability was not crucial to the court's decision.

**4.** In some instances obligations incurred by the bankruptcy estate have been treated as administrative expenses, notwithstanding the absence of obvious benefit to the estate. *See, e.g., Otte v. United States,* 419 U.S. 43, 57, 95 S.Ct. 247, 256, 42 L.Ed.2d 212, 225 (1974) (tax claim); *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (Harlan, J.) (the negligence of a receiver held to be an actual and necessary cost of administering a Chapter XI arrangement). *Compare In re Straus-Duparquet, Inc.,* 386 F.2d 649 (2d Cir.1967) (severance pay is an administrative expense because the claim arises solely from the termination of employment); *with In re Mammoth Mart,* 536 F.2d 950 (1st Cir.1976) (where severance pay is based upon the length of service, the portion earned post-petition is entitled to administrative expense status).

**5.** MPPAA § 3, 29 U.S.C. § 1001a(c) (1985) provides:

It is hereby declared to be the policy of the Act—

(1) to foster and facilitate interstate commerce.

(2) to alleviate certain problems which tend to discourage the maintenance and growth of multiemployer pension plans.

(3) to provide reasonable protection for the interests of participants and beneficiaries of financially distressed multiemployer pension plans, and

(4) to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans.

The legislative history is even more explicit:

The primary purpose of the [MPPAA] is to protect retirees and workers who are participants in [multiemployer] plans against the loss of their pensions.... [The bill] requires employers who withdraw from a multiemployer plan, or who experience severe declines in their covered operations under the plan, *to continue to fund* their fair share of the plan's unfunded benefit obligations.

H.R.REP. NO. 869, 96th Cong., 2d Sess. Part I 51–52, *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 2918, 2919–2920 ["H.R.REP. No. 869"] (emphasis added).

**6.** ERISA § 4201(b)(1), 29 U.S.C. § 1381(b)(1) (1985) provides:

The withdrawal liability of an employer to a plan is the amount determined under section § 1391 to be the allocable amount of unfunded vested benefits, adjusted ...

The term "unfunded vested benefits" is defined as:

an amount equal to—

(a) the value of nonforfeitable benefits under the plan, less

(b) the value of the assets of the plan.

ERISA § 4213(c), 29 U.S.C. § 1393(c) (1985). A nonforfeitable benefit is:

With respect to a plan, *a benefit for which a participant has satisfied the conditions for entitlement* under the plan or the requirements of this Act ... whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this Act, or the Internal Revenue Code of 1954.

ERISA § 4001(a)(8), 29 U.S.C. § 1301(a)(8) (1985) (emphasis added). Withdrawal liability is triggered when an employer withdraws from a multiemployer pension plan. ERISA § 4201(a), 29 U.S.C. § 1381(a) (1985).[7] The court in *Kessler* explained the relationship between vested benefits and withdrawal liability as follows:

ERISA, enacted in 1974, establishes the basic policy that employee pension plans should provide vested benefits to the employees. ERISA further requires employee pension plans to meet minimum standards of funding. 29 U.S.C. § 1001(c). Past accumulations of unfunded vested liabilities must be brought up to date. The statute permits this to be done over time ... *See* 29 U.S.C. § 1082(b)(2)(B)(i).

The funding requirement just described relates to unfunded vested liability which accumulated before ERISA. However, even after ERISA, unfunded vested liability relating to past service by

employees could increase. This would occur when a pension fund increased the level of benefits. Such an increase in effect "relates back." It raises the level of benefits for those who earned their benefits before the time of the increase— sometimes many years before—as well as for those who are earning their benefits currently ... The law allows these benefit increases to be funded over a period of 10 years for pensioners and surviving beneficiaries, and 25 years for vested plan participants. 29 U.S.C. § 1423(d)(1)(B)(ii).

When a contributing employer withdraws from a group pension plan, this creates a problem regarding that employer's share of any unfunded vested liabilities. Prior to MPPAA such an employer was under no obligation to pay his share of the unfunded vested liability. MPPAA establishes the concept of "withdrawal liability." The statute imposes upon the withdrawing employer a liability for his share of the total unfunded vested liability of the pension plan to which he has been contributing. 29 U.S.C. §§ 1381 and 1383(a). This share is fixed according to one of several methods provided in the statute. 29 U.S.C. § 1391.

*Kessler*, 55 B.R. at 737. *See T.I.M.E.—DC, Inc. v. Management-Labor Welfare & Pension Funds, of Local 1730 International Longshoremen's Ass'n.*, 756 F.2d 939, 943–44 (2d Cir.1985).

Central States argues that its withdrawal liability claim was incurred post-petition because the triggering event, PHE's complete withdrawal,[8] occurred post-petition. There is some support for this position. *See*

---

7. ERISA § 4201(a), 29 U.S.C. § 1381(a) (1985) provides:

If an employer withdraws from a multi-employer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

8. A complete withdrawal occurs when an employer:

(1) permanently ceases to have an obligation to contribute under the plan or

(2) permanently ceases all covered operations under the plan.

ERISA § 4203(a), 29 U.S.C. § 1383(a) (1985). The event triggering withdrawal has not been clearly articulated. PHE ceased all operations approximately a month after filing its petition. Five days after ceasing operations, the collective bargaining agreement expired by its own terms without renewal. Pursuant to ERISA § 4203(a), 29 U.S.C. § 1383(a) (1985) either of those events could be sufficient to constitute a withdrawal.

*United Department Stores,* 49 B.R. at 467 n. 8; and *cf. In re Computerized Steel Fabricators, Inc.,* 40 B.R. 344, 12 B.C.D. (CRR) 72 (Bankr.S.D.N.Y.1984). In *Computerized,* the debtor ceased operations seven months after receiving a discharge under Chapter XI of the former Bankruptcy Act. The debtor's pension fund then asserted a claim for withdrawal liability. The debtor moved the bankruptcy court for contempt, arguing that any claim by the fund was discharged. *Computerized,* 40 B.R. at 346–47. The court held that "post-confirmation withdrawal liability ... was neither provable nor dischargeable under the Bankruptcy Act ..." *Id.* at 349. Because the "entire liability was triggered" post-confirmation when the debtor withdrew from the plan, "... [discharge] did not affect [the debtor's] post-confirmation withdrawal liability." *Id.* The court stated that "merely because the calculations of amounts in arriving at such liability include pre-petition and pre-confirmation factors does not mean that such liability should be regarded as having accrued either during a pre-petition or pre-confirmation period." *Computerized,* 40 B.R. at 349. The court cited *Kessler* in support of this holding. However, *Kessler* reached precisely the opposite conclusion.

The *Computerized* decision received some oblique support in a footnote in *United Department Stores,* 49 B.R. at 467 n. 5. In *United Department Stores,* Judge Lifland held that a withdrawal liability claim was *not* entitled to administrative priority treatment, because withdrawal provides no benefit to the estate. He distinguished *Computerized* on the ground that the withdrawal liability claim there "was not triggered until post-confirmation, [therefore] the Fund's potential claim passed through the reorganization unaddressed and unaffected ... confirmation ... had no effect on the post-confirmation event of withdrawal." *Id.*[9]

Although withdrawal liability may be triggered by a post-petition event, the conclusion that it then constitutes a "post-petition claim" for bankruptcy purposes is unsupported by applicable law and is inconsistent with important bankruptcy policies. In substance, the claim is an obligation to ensure the payment of pension benefits which have previously accrued but are not payable until a future date. *Kessler,* 23 B.R. at 724; *Cott,* 47 B.R. at 491. The liability i.e., the "right to payment,"[10] is incurred when the employee benefits become nonforfeitable. An employer may meet this obligation either by continuing normal operations and making the required regular contributions into the plan, or by withdrawing from the plan and paying the withdrawal liability. *Kessler,* 55 B.R. at 740. The liability may be unliquidated and the amount may be contingent upon withdrawal or whether the vested benefits are unfunded, but such uncertainties do not defeat the existence of pre-petition claims for benefits which accrued prior to withdrawal, which stem from pre-petition events and conduct and which were nonforfeitable and fully vested prior to filing. Termination of operations merely accelerates the obligation and permits the determination of its liquid amount. *Cott,* 47 B.R. at 491.

Since the debtor here continued to operate post-petition, it is likely that some portion of Central States' claim represents the vesting of nonforfeitable benefits and the accrual of withdrawal liability during the period of administration. Because the "claim" for bankruptcy purposes arises from the accrual of employees' vested rights rather than the act of withdrawal, and because the debtor did have a short period of post-petition operations, a portion

---

**9.** Judge Lifland also noted that the *Computerized* court was not confronted with the issue whether a post-petition, pre-confirmation withdrawal liability was entitled to administrative expense treatment.

**10.** 11 U.S.C. § 101(4)(A) (1985) provides:

"claim means—
 (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

of Central States' claim is properly characterized as post-petition. *Cf. Cott*, 47 B.R. at 487 (apportioning the withdrawal liability claims into pre- and post-petition portions and concluding that the amount which accrued post-petition was entitled to administrative priority treatment).

This view of withdrawal liability claims conforms with the Code's fundamental policies of equity of distribution and of encouraging entities to do business with the post-petition debtor. Employees who work post-petition must assume that until their collective bargaining agreement with the debtor is affirmatively rejected, the compensation and benefits which they previously bargained for will have post-petition attributes, including the possibility of administrative expense treatment to the extent that services rendered satisfy 11 U.S.C. § 503(b) (1985).[11] To collapse all withdrawal liability—that attributable to pre-and post-petition vesting—into a single post-petition claim prostitutes the basic bankruptcy principle that similarly situated claimholders should receive equitable distributions of the debtor's assets. The withdrawal liability attributable to pre-petition labor is generically indistinguishable from the rights acquired by any pre-petition creditor who provides contractual services or goods to the debtor, accrues a right to payment from the debtor, but is not paid as of the date of the petition. Nothing in ERISA or in the Code suggests that the post-petition triggering of withdrawal liability was intended to convert the pre-petition accrual of employee rights into a post-petition obligation.

11. Several bankruptcy courts have rejected the theory that employees work in consideration of payment of withdrawal liability. *United Department Stores*, 49 B.R. at 462; *In re Goldblatt Bros.*, slip op. at 5 ("They work for their own interest"); *Kessler*, 23 B.R. 722, 724 (Bankr.S.D. N.Y.1982). There are good reasons for finding otherwise.

Employees as part of the collective bargaining process negotiate the terms and conditions of their pension rights, and that obligation is enforceable by the union members as either a contractual or statutory right. It is an integral part of the compensation scheme agreed to by the debtor and its employees. *See* ERISA § 502,

## III.

Central States argues that regardless of whether it is entitled to administrative treatment under § 503(b), it may receive such treatment because it relied on the description of Class 2 in the disclosure statements. Nothing in the disclosure statements suggests that withdrawal liability was intended to be included as a Class 2 administrative claim. The disclosure statements recite that Class 2 claims include expenses *"incurred ... in ... winding down the business."* As demonstrated above, withdrawal liability accrues when employee benefits become nonforfeitable, not when the employer withdraws by winding down the business.

Even if withdrawal liability fit within the disclosure statement's description of Class 2 administrative claims, it would still not automatically be allowable as an administrative expense. I have already emphasized the fundamental principle of bankruptcy law that the estate should be equitably distributed among creditors. *Mammoth Mart*, 536 F.2d at 953. If there is to be alteration of the logical order of distribution, that change should be clearly indicated by Congress. Accordingly, priority statutes are strictly construed. *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23, 29 (1952) (Douglas, J.); *Mammoth Mart*, 536 F.2d at 953. A court is not free to alter priorities in contradiction to the statute. *See Matter of Columbia Ribbon Co.*, 117 F.2d 999, 1002 (3d Cir.1941); *In re Delaware Hosiery Mills*,

29 U.S.C. § 1132(a)(3) and *see also* H.R.REP. NO. 869, 51, 53, *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS at 2921. The essence of withdrawal liability is to ensure that employees receive the benefits which they have bargained for and earned. *See* H.R.REP. NO. 869, 53 *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS at 2921. If employees work post-petition, contractual and statutory rights like withdrawal liability are properly characterized as post-petition obligations to the extent they accrue after a bankruptcy filing. Such "claims" may or may not be fully entitled to administrative expense treatment under § 503.

*Inc.*, 202 F.2d 951 (3d Cir.1953). Since the portion of Central States' claim attributable to pre-petition labor cannot be a post-petition claim entitled to administrative expense priority under § 503(b), this court may not construe PHE's plan of liquidation to give Central States greater rights than it is entitled to under the statute.[12]

### IV.

Central States argues that PHE failed to mitigate the withdrawal liability claim by rejecting the collective bargaining agreement pursuant to 11 U.S.C. § 365 (1985), thus it should not be relieved of the burden of its mistake. This argument is consistent with Central States' mistaken view that the timing of acceleration of withdrawal liability under ERISA § 4201(a), 29 U.S.C. § 1381(a) (1985) determines the pre- or post-petition nature of the pension fund's claim. As demonstrated above, it is the accrual of rights through labor by employees not the event of withdrawal which determines when the claim arises for bankruptcy purposes.

As applicable to this proceeding[13] § 365(d) contains an internal lack of symmetry on the subject of what happens in a Chapter 11 case if the debtor neither assumes nor rejects an executory contract. Section 365(d)(1) automatically rejects an executory contract if the trustee in a Chapter 7 case does not act within the deadlines provided. Rejection creates a claim for breach of contract which relates back to a date "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1) (1985). *See Concrete Pipe*, 28 B.R. at 837; *Cott*, 47 B.R. at 490–91. Section 365(d)(2) permits the trustee (debtor-in-possession) in a Chapter 11 case to assume or reject before confirmation, but provides no automatic outcome in the event here presented—where the debtor-in-possession takes no action during the permissive period. Section 1123(a) does not mandate that a debtor-in-possession deal with its executory contracts in the plan, rather assumption or rejection are permissive plan provisions under § 1123(b)(2). As we have addressed elsewhere,[14] there are good reasons to require judicial review (if not creditor review) of the process of assumption or rejection of contracts. At least one commentator indicates that an executory contract "rides through" and the parties remain bound if no action to assume or reject is taken during administration of the Chapter 11 case. 2 L. KING, COLLIER ON BANKRUPTCY ¶ 365.03 at 365–26–27 (15th ed. 1985).

■ What becomes of an executory contract not addressed at or before confirmation of a Chapter 11 case need not be decided here. Our holding is simply limited by the peculiar facts of this case. Where an executory labor contract is neither assumed nor rejected before confirmation and the debtor ceases operations and the contract expires during the period of administration, withdrawal liability must be apportioned. To the extent that withdrawal liability arises from pre-petition labor and the pre-petition vesting of rights, it is a pre-petition claim. To the extent withdrawal liability arises from post-petition labor and the post-petition vesting of rights, it is a post-petition obligation which may be entitled to administrative expense treatment, in whole or in part, pursuant to 11 U.S.C. § 503(b) (1985).

### V.

It remains to determine what part of Central States' claim is allocable to the

---

**12.** No opinion is intended of the rights of creditors to vote for an alteration of the normal priorities of distribution pursuant to confirmation of a Chapter 11 plan. Such was clearly not the intent of the parties to this Chapter 11 case. Central States did not assert administrative expense status for its withdrawal liability claim until after confirmation.

**13.** Section 365(d) was amended by the 1984 Bankruptcy Amendments and Federal Judgeship Act but the old form of the section is applicable to this proceeding. BAFJA, Pub.L. No. 98–353, § 553 (1984).

**14.** *Sealy Uptown v. Kelly Lyn Franchise Co.*, 26 B.R. 441 (Bankr.M.D.Tenn.) *aff'd*, 33 B.R. 112 (M.D.Tenn.1983).

post-petition period and whether any part of that post-petition obligation is entitled to administrative expense treatment.

▪ A debtor-in-possession is obligated to pay for the reasonable value of services rendered to the estate. *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 530, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482, 499 (1984). *Cf.,* 11 U.S.C. § 503(b)(1). The doctrine of "administrative rent" applies this rule to benefits received under an executory contract prior to its assumption or rejection. *See* Bordewieck, *The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract,* 59 AM.BANKR.L.J. 197, 221–28 (Summer 1985). In *Bildisco* the court stated:

> If the [debtor-in-possession] elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the [debtor-in-possession] is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract.

*Bildisco,* 465 U.S. at 531, 104 S.Ct. at 1199, 79 L.Ed.2d at 499. If the amount so determined meets all of the requirements of § 503, then that amount receives first priority as an administrative expense. *Mammoth Mart,* 536 F.2d at 954.

▪ PHE received benefits under its collective bargaining agreement for 37 days before it ceased operating. In the absence of evidence to the contrary,[15] I find that the reasonable value of the services rendered to PHE's estate equals the amount specified in the collective bargaining agreement. *See supra* n. 11. This includes the portion of PHE's withdrawal liability which is fairly allocable to the 37 days it operated as a debtor-in-possession. *See Cott,* 47 B.R. at 487. That amount accrued post-petition and constitutes a post-petition obligation of the estate. The remainder of Central States' claim is a pre-petition, unsecured claim.[16] *Id.*

Because of their dramatically differing views of this proceeding, the parties have not yet proposed an acceptable method for calculating the amounts described above. I am unable on the current state of the record to make the allocation of Central States' claim into its pre- and post-petition components.[17] Moreover, neither party has

---

**15.** No evidence was presented to demonstrate that any other measure of value should be applied.

**16.** As stated in our prior decision, the pre-petition unsecured claim of Central States is treated as follows by the Bankruptcy Code:

> Although withdrawal liability was established as a significant safeguard against the collapse of pension plans, *see In re Kessler,* 23 B.R. 722, 725 (Bankr.S.D.N.Y.1982), Congress did not include withdrawal liability as a special class of claims entitled to priority under the Bankruptcy Code and withdrawal liability is treated as an ordinary unsecured claim. *In re Granada Wines, Inc.,* 26 B.R. 131, 134 (Bankr. D.Mass.1983). 11 U.S.C.A. § 507(a)(4) (West 1979) provides a fourth level of priority for unsecured claims for contributions to employee benefit plans arising within 180 days prior to the petition and limits the amount of priority to $2,000 per employee.

*Pulaski Highway Express, Inc.,* 41 B.R. at 311.

**17.** Central States, based on one of the mathematical methods for calculating withdrawal liability offered in ERISA, argues that a substantial portion of its $820,382.24 claim is properly allocable to the post-petition period. This argument is flawed for several reasons.

ERISA § 4211, 29 U.S.C. § 1391 (1985) provides four different methods of calculating withdrawal liability. A plan may also propose its own method of calculation if it is found acceptable to the Pension Benefit Guarantee Corp. Central States asserts that because it calculates withdrawal liability according to the terms of § 1391(c)(2), under the rationale of *Cott,* the majority of its claim is attributable to post-petition factors and is entitled to administrative priority treatment.

Contrary to Central States' assertions, the formula set forth in § 1391(c)(2), is based entirely on the plan's pre-petition experience—the calculation focused on the year ending before withdrawal. Each of the allocation schemes set forth in § 1391 operates in the same fashion. First the total amount of the unfunded vested benefits is determined according to standard actuarial principles. ERISA § 4213, 29 U.S.C. § 1393 (1985). Second, the withdrawing employer's fractional share of that sum is determined pursuant to one of the alternatives in § 1391. These alternatives all, in some fashion, involve applying the past contribution experience of the plan to the amount of unfunded

adequately addressed the application of § 503(b) to the post-petition portion of Central States' claim once the proper allocation is accomplished.[18] Accordingly, an evidentiary hearing will be scheduled to determine these two remaining questions within the legal framework established above.

An appropriate order will be entered.

vested benefits. Thus, the § 1391(c)(2) calculation does not focus more clearly on the post-petition time period than the calculation required by § 1391(b). Neither was designed with the task here in mind—the allocation of withdrawal liability across a point in time formed by a bankruptcy filing.

**18.** There is some temptation to embrace the holding in *Goldblatt* that withdrawal liability is incapable of allocation and thus fails entirely of characterization as an administrative expense.

However, consistent with the legal analysis above, it appears to this court that the Bankruptcy Code requires allocation of the withdrawal claim and application of § 503(b) notwithstanding that ERISA may provide no quick way to accomplish the required computations. This view is consistent with the proscription in ERISA § 514, 29 U.S.C. § 1144(d) (1985) that ERISA shall not be construed to impair the operation of the bankruptcy laws. *See Pulaski Highway Express, Inc.,* 41 B.R. at 309.