In the Matter of **UNITED MERCHANTS AND MANUFACTURERS, INC.,** et al., Debtors.

**Bankruptcy No. 90–827.**

United States Bankruptcy Court, D. Delaware.

April 18, 1994.

James L. Patton, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, DE, Michael L. Cook, Skadden, Arps, Slate, Meagher & Flom, New York City, Henry Rose, Epstein Becker & Green, P.C., Washington, DC, for debtors.

John D. Demmy, Morris, James, Hitchens & Williams, Wilmington, DE, K. Peter Schmidt, Richard P. Schifter, Arnold & Porter, Washington, DC, for ILGWU Nat. Retirement Fund.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

United Merchants and Manufacturers, Inc. objects to the proof of claim of the International Ladies' Garment Workers' Union National Retirement Fund. The United States District Court for the District of Delaware denied the Fund's motion to withdraw the reference of this objection. This is the

court's decision on this core proceeding. 28 U.S.C. § 157(b)(2)(B).

### I. Facts

There was no evidentiary hearing held on the objection of United Merchants and Manufacturers, Inc. to the claim, as the parties agreed their dispute was solely of a legal nature. The parties submitted a stipulation of facts, some of which are reiterated below. Section I.A. also contains legal discussion that is more appropriately placed here to explain the background of this proceeding.

### A. The Fund and Withdrawal Liability

The International Ladies' Garment Workers' Union National Retirement Fund is an employee pension benefit plan and a multiemployer plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), as modified by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). The Retirement Fund provides pension benefits principally to members of the International Ladies' Garment Workers' Union.

The Retirement Fund is funded by contributing employers' periodic payments. See generally 29 U.S.C. § 1392(a). The amount of the payments must comply with annual "minimum funding standards." § 1082. These standards are based upon asset values, actuarial assumptions, and other variables that may turn out to be incorrect. Consequently, despite each employer honoring its minimum funding obligations, "underfunding" of a plan may occur.[1] Moreover, the Fund is obliged to provide benefits to covered employees regardless of whether an employer ceases contributions to the multiemployer plan. Multiemployer pension plans can operate with a certain degree of unfunded benefit liabilities.[2]

■ At issue in this objection to claim proceeding is the concept of "withdrawal liability." Withdrawal liability is the multiem-

---

1. For example, an employee's benefit may be based upon compensation at the time of her retirement. If that level of compensation is higher than expected, the plan's previous contributions may not be sufficient.

2. Indeed, these plans may amortize certain unfunded liabilities over a period of thirty years. See generally § 1082(a)(2), (b)(2), (b)(3).

ployer plan equivalent of single-employer plan termination liability. Withdrawal liability should not be confused with employer liability for failing to satisfy its annual minimum funding standards. *See generally,* Harold S. Novikoff & Beth M. Polebaum, *Pension–Related Claims in Bankruptcy Code Cases,* 40 Bus.Law. 373, 389–398 (1985).

Withdrawal liability depends primarily on the concepts of "unfunded vested benefits" and "withdrawal." Unfunded vested benefits arise when a plan accumulates obligations to pay vested employee benefits greater than the value of its plan. 29 U.S.C. § 1393(c).

Generally, an employer "withdraws" from a multiemployer pension and employee benefit plan when it ceases all covered operations under the plan, or ceases to have an obligation to contribute under the plan. *E.g.,* 29 U.S.C. § 1383(a). Withdrawal liability, which is discussed at length in Sections II.B. and II.C., is the MPPAA-created obligation requiring a withdrawing employer to make additional cash payments to the plan that approximate that employer's pro rata share of the unfunded vested benefits.

B. *The UM & M Debtors and Their MPPAA History*

United Merchants and Manufacturers, Inc. is a diversified company engaged in the design, manufacture and distribution of apparel and accessories. Jonathan Logan, Inc. and United Merchants Trucking, Inc. were wholly owned subsidiaries of UM & M. United Merchants Trucking was engaged in transporting the merchandise for UM & M to its customers and third parties. Jonathan Logan leased certain retail store locations, which it operated for UM & M. Jonathan Logan had been a contributing employer to the Fund prior to 1980 (when the MPPAA was enacted). In late 1984, UM & M acquired Jonathan Logan and thus became a contributing employer to the Fund.

UM & M, Jonathan Logan, and United Merchants Trucking filed Chapter 11 petitions in this court on November 2, 1990.[3] A joint plan of reorganization was confirmed on August 15, 1991, and it became effective on August 26, 1991. Pursuant to that plan, Jonathan Logan and United Merchants Trucking were merged into UM & M. The reorganized debtor continues to operate under the name of "United Merchants & Manufacturers, Inc.".

Multiemployer plans are maintained pursuant to collective bargaining agreements. 29 U.S.C. §§ 1002(37)(A), 1301(a)(3). The Debtors acknowledged their MPPAA contribution obligations within four such agreements which existed pre-petition. *See* § 1392(a). UM & M assumed these agreements pursuant to the joint plan. Each of these agreements was between one of the Debtors and an employees' union. Through the date of confirmation, the Debtors made every contribution payment to the Fund that each of the collective bargaining agreements and the MPPAA required. This flawless contribution history includes payments made in connection with UM & M's Rose Marie Reid and Imerman divisions, as well as 11 other divisions and related entities, and over a time period greater than six years before the Chapter 11 filings. At the time of those filings, the Debtors' only remaining contributory operations were the Rose Marie Reid and Imerman divisions.

Unfunded vested benefits existed for the years 1985 through 1989 (all pre-petition years), as well as 1990 and 1991. At the end of 1991, the unfunded vested benefit amount was estimated at $488,176,900. Docket number 903, Exhibit A. If UM & M had withdrawn in this year, the Fund estimates UM & M's withdrawal liability at approximately $22,497,426. *Id.*

Both parties emphasize that UM & M did *not* withdraw prior to the confirmation of the plan, and that no withdrawal liability occurred prior to the confirmation.

C. *The Proof of Claim*

In May 1991, the Fund filed a document entitled "proof of claim" against the three Debtors. This document shall be referred to

---

3. United Merchants Trucking ceased operations following the filings. However, neither party asserts that United Merchants Trucking was a contributing employer or that this cessation constituted a withdrawal.

as the "proof of claim" or "claim" for convenience purposes only, as the Fund has continuously asserted that it has no claim or rights against the Debtors, but only against the reorganized debtor UM & M.

The proof of claim explained that pursuant to the MPPAA, certain of the Debtors were under continuing employer obligations to contribute to the Fund, and were completely complying with those obligations. But, the claim went on to assert, *if* these Debtors were to cease their contributory operations, "they would be liable for a complete withdrawal" or a "partial withdrawal." Claim at 2, ¶ 6.

Thus, the court infers the Fund filed the claim as a precautionary measure. While the Fund believes that its rights are against the reorganized debtor as a matter of law, it filed its claim to participate in distribution under the plan in the event a withdrawal occurred before confirmation, or its legal position turned out to be incorrect.

II. *Discussion of the Bankruptcy Claim Issue*

In February 1992, UM & M filed an objection to the Fund's proof of claim. The objection is based upon a conjunctive two-pronged argument. Despite the absence of a pre-confirmation withdrawal, UM & M argues:

1. That the Fund has a "claim" within the meaning of the Bankruptcy Code, and

2. That the claim is unenforceable against the debtor under "applicable law," 11 U.S.C. § 502(c), which here is primarily the MPPAA, and thus the claim should be valued at zero.

Section II of this Opinion discusses the first prong, and section III briefly discusses the second prong.

Under 11 U.S.C. § 1141(d), the confirmation of a plan of reorganization discharges the debtors from all debts arising before the date of such confirmation. A debt is a "liability on a claim." 11 U.S.C. § 101(12). Thus, the practical significance of UM & M's argument, if correct, is that the $22.5 million debt would be discharged, and the Fund would receive no distribution upon its claim.

In determining the merits of UM & M's objection to the Fund's claim, the first question is thus whether the Fund had a "claim" within the meaning of 11 U.S.C. § 101(5)(A) against the Debtors prior to the date of confirmation. That section states:

[C]laim means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]

11 U.S.C. § 101(5)(A).

■ Preliminarily, a mere pre-petition legal relationship between a creditor and a debtor, without more, is insufficient to create a pre-petition right to payment. *E.g., In re Anderson,* 23 B.R. 174 (Bankr.N.D.Ill.1982) (allegation of post-petition fraud arising out of pre-petition contract not a pre-petition claim). As the Third Circuit Court of Appeals has held in analyzing the issue of when a claim arises, there must exist a legal relationship that gives rise to the asserted right to payment. *In re Remington Rand Corp.,* 836 F.2d 825 (3d Cir.1988).

A. *The Remington Rand Case*

In *Remington Rand,* at issue was whether the General Services Administration of the United States government possessed a bankruptcy claim pre-confirmation against Remington arising under a contract to provide typewriter supplies. Remington had breached the contract three times prior to the filing of its Chapter 11 petition. However, the G.S.A. had not, prior to confirmation of the debtor's plan, completed a certification procedure that was a prerequisite to the G.S.A.'s ability to sue the debtor under the Contract Dispute Act of 1978 (41 U.S.C. § 605(a)). The G.S.A. argued its contract claim arose post-confirmation and was thus not discharged (the G.S.A. had not timely filed a proof of claim).

In considering this argument, the *Remington* court started with the broad Bankruptcy Code definition of a claim, as quoted above. The *Remington* court then examined the language of the Contract Act. The court found

that the Contract Act first required a governmental contract officer to find that the government indeed had a valid claim, and that this administrative requirement was a jurisdictional prerequisite to judicial resolution of the claim. 836 F.2d at 830. It also found, however, that the Contract Act did not create any substantive contractual rights; rather, it assumed the existence of a traditional cause of action. *Id.* at 831.

Consequently, in determining the existence of a right to payment, the *Remington* court considered the G.S.A.'s rights under common law contract law. The *Remington* court acknowledged the legal principles that "a party may have a bankruptcy claim and not possess a cause of action on that claim," and that a bankruptcy claim requires "a legal relationship relevant to the purported interest from which that interest may flow." *Id.* at 832 (citation omitted). Thus, the *Remington* court recognized there must exist not merely a legal relationship between the pre-petition debtor and the claimant, but a legal relationship that gives rise to the asserted right to payment. The court then applied this reasoning and held that the G.S.A.'s claim arose when it knew of the breach—this is when the right to payment arose, even though the precise amount of the damages at that time would be unknown, because the G.S.A. had not yet complied with the procedures the Contract Act required. *Id.* at 831–33. Since the breaches occurred pre-petition, and the G.S.A. learned of those breaches pre-confirmation, the *Remington* court concluded that the G.S.A. possessed a claim pre-confirmation.

### B. *The Facts and Law Here Viewed in the Remington Framework*

Before addressing the first prong of UM & M's objection to the Fund's claim, it is helpful to consider the cause of action of withdrawal liability and the material facts underlying that action in the context of the *Remington* analysis. The parties here agree that ERISA and the MPPAA, and not the collective bargaining agreements, provide the

source of non-bankruptcy law for UM & M's withdrawal liability. *Accord Trustees of Amalgamated Ins. Fund v. McFarlin's,* 789 F.2d 98, 104 n. 2 (2d Cir.1986). That law provides that UM & M is liable for a share of the Fund's unfunded vested benefit liabilities when:

1.  There are unfunded vested benefits, and

2.  UM & M then withdraws from the Fund's plan.

*See generally* 29 U.S.C. §§ 1381–1391.

Unfunded vested benefits have existed in 1985 and every successive plan year.[4] UM & M did not withdraw prior to the confirmation of the plan of reorganization.

When an employer does withdraw, the MPPAA provides for a sequence of further events precedent to the filing of a cause of action in United States District Court. First, the plan sponsor calculates the amount of withdrawal liability based upon a formula that examines the contribution history of the employer for the five plan years immediately preceding the year in which the withdrawal occurs. 29 U.S.C. §§ 1386(a)(2), 1391(b)(3)(B). The plan sponsor notifies the withdrawn employer of the amount owed, devises a schedule for payment, and demands payment according to the schedule. § 1399(b)(1).

The employer then has 90 days in which it may provide additional information, raise specific objections and request the plan sponsor to review its original findings. § 1399(b)(2). The parties have an additional time period within which they may request arbitration. § 1401(a). Finally, within 30 days of an arbitration award, either party can seek district court review. § 1401(b)(2).

### C. *The Fund Did Not Possess a Bankruptcy Claim Pre-confirmation*

■ Against this factual and legal background of the non-bankruptcy cause of action of withdrawal liability, UM & M argues that the legal relationship *Remington* requires arose when UM & M became obligated to

---

4. Exhibit A to the parties' stipulation indicates that the unfunded amount can decrease with time. The Fund further asserts that the unfund-

ed amount can be completely eliminated through ordinary contributions by employers and prudent investment by the Fund.

contribute to the Fund in 1985. This argument is too broad. It ignores whether there exists pre-confirmation underfunding of the multiemployer plan or a withdrawal. UM & M's argument also suggests that every creditor who had contracted with a debtor pre-petition possesses a bankruptcy claim, even if there were no breaches of that contract.

UM & M's argument that a contingent right to payment exists prior to underfunding and withdrawal unduly relies upon the statement in *Remington* that "a party may have a bankruptcy claim and not possess a cause of action on that claim." While it is true that the Fund could have a bankruptcy claim pre-confirmation without having a cause of action on withdrawal liability pre-confirmation, that conclusion does *not* necessarily follow. UM & M must still show the legal relationship that gives rise to the asserted right to payment.

In *Remington*, this legal relationship existed. There were several pre-petition breaches of contract under common law. The G.S.A. could not yet sue upon those breaches only because of non-performed procedures required by the Contract Dispute Act. Here, however, there is no pre-petition "breach" by UM & M, and no right to payment absent the future event of a withdrawal by UM & M.

Indeed, accepting UM & M's argument that the mere obligation to contribute to the Fund is the legal relationship that satisfies *Remington* would ignore the statutory origins of the withdrawal liability action. Before the 1980 MPPAA amendments, an action for withdrawal liability upon a contributing employer's withdrawal did not exist. Yet according to UM & M's argument, if the MPPAA had not been enacted, the Fund would have nonetheless possessed a bankruptcy "claim" since contributing employers to multiemployer plans existed under the 1974 ERISA statute.

Thus, the pre-confirmation legal relationship between UM & M and the Fund contrasts sharply with the legal relationship that exists when an employer fails to meet its minimum funding standards. *See generally* 29 U.S.C. §§ 1132, 1145 (providing cause of action for delinquent contribution).

If UM & M *had* withdrawn pre-confirmation, then since the Fund was underfunded, the legal relationship *Remington* requires *would* exist. That withdrawal would be analogous to Remington's breach of the contract, and the subsequent procedures of the MPPAA would be analogous to the administrative procedures required by the Contract Dispute Act.

Finally, in connection with its argument that the Fund's claim should be valued at zero (briefly discussed in section III), UM & M argues that even withdrawal is insufficient to create liability if the Rose Marie Reid or Imerman division is sold to a bona fide purchaser. *See generally* 29 U.S.C. § 1384. UM & M argues that as long as that purchaser makes all required contributions for the next five years, UM & M is only contingently and secondarily liable. This argument further undercuts the viability of UM & M's position that the Fund's right to payment occurred when UM & M became a contributing employer in 1985.

Not surprisingly, UM & M cites no cases adopting its argument of when a right to payment for withdrawal liability arises. UM & M has cited several court decisions discussing withdrawal liability which it argues support a favorable legal position—that the Fund's right to payment arose before confirmation. These decisions, however, disagree with UM & M (and each other) as to what is the legal relationship that gives rise to the asserted withdrawal liability. Some hold that the contingent right to payment arises when the employee labor was performed. *Trustees of Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98, 101–102 (2d Cir. 1986); *In re Chateaugay*, 130 B.R. 690, 697 (S.D.N.Y.1991); *In re Kessler, Inc.*, 23 B.R. 722, 724 (Bankr.S.D.N.Y.1982), *aff'd* 55 B.R. 735 (S.D.N.Y.1985). Other decisions hold that the contingent right to payment arises when the employee benefits become nonforfeitable or vested. *In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 507 (Bankr. M.D.Tenn.1986); *In re Art Shirt*, 93 B.R. 333, 337–38 (E.D.Pa.1988).

Significantly, all these decisions employ different reasoning than that UM & M urges

this court to adopt. *None* of these decisions hold that the contingent right to payment arises when the employer becomes obligated to contribute to a MPPAA plan.

Conceivably, this court could reject UM & M's reasoning, yet hold that the Fund had a pre-confirmation bankruptcy claim for withdrawal liability, by adopting a variation of the reasoning contained in these cited decisions. However, the court will not do so.

As the Fund points out, the factual contexts of almost all of those cases were materially different than the context here, and consequently, did not address the precise legal issue here (that the Fund has a "claim" within the meaning of the Bankruptcy Code). For instance, in *Trustees of Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98 (2d Cir.1986), the issue was whether the withdrawal liability of the debtor McFarlin's Inc. was an administrative expense under 11 U.S.C. § 503(b). The *McFarlin's* court focused on the services rendered giving rise to the liability, and on the "consideration supporting the Fund's right to receive [the withdrawal liability amount]." *Id.* at 101. After reviewing the legislative history of ERISA and MPPAA, the court concluded that "the consideration supporting [McFarlin's] withdrawal liability was . . . the work of employees in the alteration department during [1975–1981]." *Id.* at 103. That court did *not* analyze whether the right to payment of the fund arose pre-petition, or whether a legal relationship arose pre-petition that gave rise to the withdrawal liability.

The court will also not extend the rulings contained in the decisions UM & M cites to the issue here. The reasoning germane to the withdrawal liability contained in some of those decisions is not persuasive. UM & M itself criticized the analysis of ERISA and the MPPAA by the *McFarlin's* and *Pulaski* courts, and those courts' conclusions about when the contingent right to payment to withdrawal liability arises. Docket Number 721 (UM & M's opening brief) at 20, 22.

The reasoning contained in *In re Art Shirt*, 93 B.R. 333 (E.D.Pa.1988) (a third decision

UM & M cites) is also questionable. There, the court held that withdrawal liability should be considered a debt for the purposes of determining the debtor's pre-petition insolvency under § 547(b) of the Bankruptcy Code. That decision relied on the legal proposition that "[a]ccumulations of funding deficiencies must be brought up to date and the failure to do so can result in employer liability." *Id.* at 338 (citations omitted). That proposition, which may be valid in a single-employer plan, does not apply to a contributing employer in a multiemployer plan which has satisfied its minimum funding obligations.[5]

Finally, because the decisions UM & M cites do not address the same legal issue raised in this proceeding, those decisions do not focus upon the successive stages of the legal relationship between the plan and contributing employer as contemplated by the 1980 MPPAA amendments. Thus, while those decisions properly recognize the salutary effect of the MPPAA and withdrawal liability on the protection of employee pension benefits, those decisions place insufficient weight upon the connection between withdrawal liability and protecting the financial viability of a multiemployer pension plan that has been historically underfunded.

Prior to the 1980 MPPAA amendments, when an employer withdrew, the remaining employers contributing to the fund were liable for the unfunded vested benefits. This increased the financial obligations on the remaining employers. When the industry as a whole was declining, the additional financial burden only exacerbated existing financial problems of the remaining employers. H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. I at 53–55, 60 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918, 2921–23, 2928. Congress recognized that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management re-

---

**5.** The *Art Shirt* court was apparently confusing a withdrawal liability situation with a delinquent contribution situation.

lations." 29 U.S.C. § 1001a(a)(4)(A); *see also* 29 U.S.C. § 1001a(a)(4)(B); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 721–725 & nn. 2–3, 104 S.Ct. 2709, 2713–16 & nn. 2–3, 81 L.Ed.2d 601 (1984).

Consequently, Congress enacted the MPPAA "to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." H.R.Rep. 96–989, at 67, *reprinted in* 1980 U.S.C.C.A.N. at 2935. Because under the MPPAA, the Pension Benefit Guaranty Corporation guaranteed all multiemployer pension plans, 29 U.S.C. § 1322a, withdrawal liability also reduced the possibility that the PBGC's guaranty obligations would exceed its financial capacity. Withdrawal liability was thus designed to address an industry problem that would arise *going forward* if the withdrawing employer was not required to make a final payment that approximated its pro-rata portion of the vested unfunded amount, and, Congress determined that withdrawal should be the legally significant event triggering that liability.

■ Thus, as some of the decisions UM & M cited implicitly recognize, the employee's right to payment against a MPPAA plan may arise when her pension benefits vest. This does not, however, address the question of when a MPPAA plan's right to payment against a withdrawing employer arises. Construing the right to payment to arise when the employer withdraws rather than at an earlier point in time properly recognizes the purpose of withdrawal liability.

UM & M has also cited many decisions which have nothing to do with withdrawal liability, but which it believes support its view that the Fund possesses a bankruptcy claim. These decisions involve non-bankruptcy causes of action of an entirely different character, such as indemnity claims, severance pay claims, and environmental claims.

The court finds these cases of limited use, and not helpful to UM & M's position. In ruling on UM & M's objection to the Fund's claim, the court must determine whether the Fund possessed a bankruptcy claim, and therefore whether there existed pre-confirmation a legal relationship that gave rise to a right to payment for withdrawal liability. This depends on a careful analysis of the unique nature of withdrawal liability, and not the other types of actions listed above.

The court has also considered the policy arguments which the parties raise relating to whether the Fund's claim should be deemed to be a bankruptcy claim. First, as discussed above, holding that withdrawal liability is not a bankruptcy claim under the facts here accords with ERISA policy.

As to the Bankruptcy Code, UM & M emphasizes the policy of equal treatment for creditors, as well as the "fresh start" policy. Assertion of these policies merely begs the questions of whether the Fund is a creditor of the debtors, and whether UM & M, by the discharge of the Fund's withdrawal liability, would receive a fresh start, or an inappropriate "head start" on future potential liability for future breaches of its MPPAA obligations. Also, the legal reasoning and holding UM & M urges this court to adopt would require MPPAA plans to file claims based upon the hypothetical speculation that a MPPAA debtor might withdraw at some time in the future, and that at the time of the future withdrawal, there might exist unfunded vested benefits. *See Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942–44 (3d Cir.), *cert. denied* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (rejecting rule that exposure to asbestos creates right to payment for F.E.L.A. tort cause of action).

■ For all of these reasons, the court holds that the Fund did not possess a bankruptcy claim for withdrawal liability pre-confirmation. Withdrawal liability requires both an unfunded vested benefit amount and a withdrawal. Only a withdrawal can trigger the contingent right to payment for withdrawal liability. It is this withdrawal that first creates the legal relationship which gives rise to the asserted right to payment.[6]

6. This holding would not change if the right to payment analysis was based upon the Fund's

rights under the collective bargaining agree-

The Fund has alternatively argued that because UM & M assumed the collective bargaining agreements related to UM & M's obligations under the MPPAA, any withdrawal liability is not discharged. In light of the court's rulings above, it is not necessary to reach this issue.

### III. *The Court Will Not Value the Extent of UM & M's Liability*

In connection with the second prong of UM & M's argument in support of its objection to the Fund's proof of claim, UM & M argues that a post-confirmation sale of the Rose Marie Reid and Imerman divisions does not create a "withdrawal" under 29 U.S.C. § 1384 that subjects UM & M to withdrawal liability. UM & M argues that it is only contingently and secondarily liable, as it construes the MPPAA to impose liability only if the buyer of the Rose Marie Reid and Imerman divisions defaults on its contribution obligations during the five plan years after the sale. UM & M concludes the court should estimate the value of the Fund's claim at zero.

The court need not address that argument. Whatever the value of the Fund's withdrawal liability claim, that claim is against the reorganized UM & M, and not the debtors' estates. That claim, to the extent it is disputed, is not before this court in this objection to claim proceeding.

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, April 18, 1994, for the reasons stated in the attached Memorandum Opinion, the objection of United Merchants and Manufacturers, Inc. to the proof of claim of the International Ladies' Garment Workers' Union National Retirement Fund is OVERRULED.

ments; indeed, focusing upon these agreements would only strengthen the Fund's position.