In re CD REALTY PARTNERS, Condyne, Inc., Condyne Freezers, Inc., CD Milton Realty Trust, CD Realty Trust XI, CD Realty Trust 51, CD Realty Trust 70, Debtors.

Bankruptcy Nos. 89–13632–CJK, 89–13697–CJK, 89–13698–CJK, 89–13737–CJK, 89–13640–CJK, 89–13649–CJK and 89–13652–CJK.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 18, 1997.

Kimberly I. McCarthy, Quincy, MA, for Condyne Freezers, Inc.

Christopher N. Souris, Boston, MA, for New England Teamsters and Trucking Industry Pension Fund.

### MEMORANDUM OF DECISION ON MOTION OF CONDYNE FREEZERS, INC. TO HOLD PENSION FUND IN CONTEMPT

CAROL J. KENNER, Chief Judge.

By the motion before the Court, Condyne Freezers, Inc. ("Condyne") seeks an order declaring the New England Teamsters and Trucking Industry Pension Fund ("the Fund") in contempt of the discharge provisions in this Court's "Order Confirming Fifth Amended Plan of Reorganization (Freezer Business and Related Real Estate)," entered in Chapter 11 case no. 89–13698–CJK and related cases, and enjoining the Fund from further action to enforce its claim against Condyne. The claim at issue is one for "withdrawal liability" under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.* Condyne argued that when the Court entered the confirmation order, the withdrawal liability existed as a contingent claim and therefore was among the debts discharged by the order. The Fund argues that its claim arose only later, upon the Debtor's withdrawal from the Fund, and therefore was not discharged at confirmation and may now be collected. For the reasons set forth below, the Court holds that the withdrawal liability was a contingent claim and, as such, has been discharged.

### FACTS AND PROCEDURAL HISTORY

Because it was unclear from the parties' initial memoranda whether material facts were in dispute, the Court treated Condyne's motion as one for summary judgment[1] and ordered Condyne to submit such affidavits and other evidence as it deemed necessary to support its motion. Condyne submitted only one affidavit, that of Donald J. O'Neill, the president of Condyne. The Fund has submitted no evidence of its own and appears to accept the facts as adduced by Condyne.

The facts are as follows. Debtor Condyne Freezers, Inc. (hereinafter, "the Debtor")[2] petitioned for relief under Chapter 11 of the Bankruptcy Code on November 29, 1989. Its case was jointly administered with the Chap-

---

1. F.R.Civ.P. 56 applies in contested matters. F.R.Bankr.P. 9014.

2. As will be explained more fully below, the Movant, Condyne Freezers, Inc., is a separate and distinct entity from the Debtor, Condyne Freezers, Inc. A new corporation was created by and upon confirmation of the Debtor's Fifth Amended Plan of Reorganization. The Movant is a successor to the new corporation, which was itself a successor to the Debtor. All references in this memorandum to "Condyne" and "Condyne Freezers" are to the movant. The original entity shall be referred to as the Debtor.

ter 11 cases of several related corporations and trusts.

In 1988, the Debtor took over some of the business operations of Connecticut Cold Storage Company ("CCS"), which was obligated to contribute to the Defendant New England Teamsters and Trucking Industry Pension Fund. The Fund is a multiemployer pension fund and is subject to the provisions of ERISA. Prior to 1988, the Debtor was not a contributing employer to the Fund. The bulk of the contribution history on which the Fund bases its current demand for withdrawal liability against Condyne is attributable to CCS's contribution history. If Condyne's contribution history were used to the exclusion of the preconfirmation history of CCS and the Debtor, Condyne would owe no withdrawal liability to the Fund.

After filing its bankruptcy petition, the Debtor listed the Fund in its bankruptcy schedules as a creditor with respect to certain delinquent contributions, but not the liability now at issue. The Debtor's bankruptcy counsel filed a certificate of service certifying that notice had been mailed to the list of creditors of the bar date for filing claims in the case. The Fund is listed on the notice mailing list that was used to notify creditors of the bar date for filing claims.[3] The bar notice explicitly stated that a proof of claim must be filed by "any person, whether or not such person is listed on the schedules, who asserts a claim against a Debtor or Debtors that is not listed on the Schedules." Despite the notice, the Fund did not file a proof of claim for withdrawal liability.

The Court confirmed the Debtor's "Fifth Amended Plan of Reorganization (Freezer Subsidiaries and Related Real Estate)" (the "Plan") on November 29, 1990. Paragraph 6 of the Confirmation Order stated:

> except as otherwise specifically provided for by the Plan, this Order, or any other orders in aid of consummation ... all ... debts, interests, and obligations of the Debtors are hereby discharged.

Paragraph 6 of the Order also enjoined all creditors whose debts were discharged by the Plan from

instituting or continuing any action or employing any process to collect such debts or pursue such interests as liabilities or obligations of the Debtor, or any successor to the Debtor, except as otherwise specifically provided for by the Plan, this Order, or any orders in aid of consummation that may be entered by the Court.

Though it was not formally dissolved, the Debtor ceased functioning as a corporate entity after the reorganization. The Plan created a reorganized holding company and a reorganized freezer subsidiary to carry on the Debtor's business after confirmation. Pursuant to the Plan, the reorganized holding company assumed liability for satisfaction of all claims against the Debtor, but only to the extent and in the manner provided in the Plan. The Plan required that neither the reorganized holding company nor the reorganized freezer subsidiary be subject to liability for any of the Debtor's liabilities by reason of the transfer of the Debtor's assets under any theory of transferee or successor liability, other than the liabilities specifically preserved in the Plan. The Plan did not preserve the Fund's withdrawal liability claim as a liability of either the reorganized holding company or the reorganized freezer subsidiary. The Plan did not address withdrawal liability at all.

Since confirmation of the Plan, the reorganized freezer subsidiary has been restructured at least twice. Condyne is the reorganized freezer subsidiary currently in business. The Fund has made demand against Condyne for withdrawal liability in the principal amount of $107,918.00. In addition, the Fund has also indicated that it may seek liquidated damages, interest, costs, and attorney's fees against Condyne. The demand has caused Condyne to incur substantial costs and attorneys' fees to bring this motion and to defend against the Fund's demand.

By the motion before the Court, Condyne asks that the Court (1) declare that the Fund's claim was a preconfirmation claim and as such was discharged by 11 U.S.C. § 524(a)(2) and the Confirmation Order; (2)

---

**3.** The Fund does not contend that it did not receive notice of the bar date.

adjudge the Fund in contempt of the confirmation order; (3) enjoin the Fund from taking any further action to collect on its discharged preconfirmation claim; and (4) award Condyne the actual damages it incurred in defending against the Fund's contemptuous actions, including reasonable attorney's fees.

### JURISDICTION

This is a proceeding to enforce the Court's confirmation order and to determine the dischargeability of a debt. As such, it is a core proceeding, as to which the Court may enter an appropriate order. 28 U.S.C. § 157(b)(1) and (b)(2)(I) and (L).

### ARGUMENTS

If, when the Debtor's plan was confirmed, the Fund had a claim—even a contingent claim—against the Debtor for the withdrawal liability it now seeks to collect, then that claim has been discharged. This is the premise of Condyne's argument, and the Fund does not dispute it. The parties disagreement is limited to the one issue thus framed: whether, as of the date of confirmation, the right to payment that the Fund now seeks to enforce existed as a "claim" within the meaning of 11 U.S.C. § 101(5).

Condyne argues that the right to payment, though contingent at the time, nonetheless constituted a claim within the meaning of § 101(5). The Fund argues that Condyne's argument is predicated on a misunderstanding of the nature of withdrawal liability under the MPPAA. According to the Fund, withdrawal liability does not accrue over time and does not arise until the contributing employer withdraws from the Fund. The amount of the employer's liability is entirely contingent on the financial condition of the Fund at the time of the withdrawal, not on prewithdrawal events. The Fund also argues that although "claim" is defined to include even those that are contingent, the degree of contingency is relevant, and the claim at issue was so contingent before con-

firmation that it could not fairly have been deemed a claim at all.

### DISCUSSION

With certain exceptions not applicable here, the confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). Debts that arose before the date of confirmation are discharged whether or not

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 [of the Bankruptcy Code];

(ii) such claim is allowed under section 502 [of the Bankruptcy Code]; or

(iii) the holder of such claim has accepted the plan.

*Id.* Therefore, as the parties agree, if the debt that the Fund now seeks to enforce was in existence on the date of confirmation, it has now been discharged and cannot now be enforced against the Debtor or against Condyne, as the Debtor's successor in interest. 11 U.S.C. § 524(a)(2) (a discharge operates as an injunction against any act to recover a debt as a personal liability of the debtor).

 As defined and used in the Bankruptcy Code, "debt" means "liability on a claim," 11 U.S.C. § 101(12). And "claim," in turn, means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The Code thus defines "claim" broadly, including even those claims that remain contingent and, as such, may be difficult or impossible to quantify. *Woburn Associates v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1, 8 (1st Cir.1992) (*"Hemingway"*) (Congress defined claim "as broadly as practicable."). If necessary to expedite the administration of the case, the Bankruptcy Code requires that contingent and unliquidated claims be quantified by estimation. 11 U.S.C. § 502(c) [4]; *Hemingway, supra,* at 8. Consequently,

---

**4.** In relevant part, section 502(c) provides:
 There shall be estimated for purpose of allowance under this section—
 (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may

be, would unduly delay the administration of the case.
11 U.S.C. § 502(c)(1).

[t]he difficulty or impossibility of estimation no longer constitutes a legitimate basis for disallowing any prepetition right to payment as a "claim" against the estate. *See In re Baldwin–United Corp.,* 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985) ("An estimate necessarily implies no certainty.... It is merely for the purpose of permitting the case to go forward." (quoting *In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 66 (Bankr.E.D.Va.1982))).

*Hemingway, supra,* at 8. Congress deliberately included contingent claims in the definition and made provision for their estimation to permit " 'the broadest possible relief in the bankruptcy court,' " *In re Black,* 70 B.R. 645, 649 (Bankr.D.Utah 1986) (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977), U.S.Code Cong. & Admin.News 1978, p. 6266), and to ensure that "virtually all obligations to pay money [would] be amenable to treatment in bankruptcy." *In re Robinson,* 776 F.2d 30, 34 (2d Cir.1985) (survey of post-Bankruptcy Act cases recognizing expansion of term "claim"), *rev'd on other grounds,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). *Hemingway, supra,* at 8.

The Fund concedes that "claim" includes unmatured and contingent rights to payment, but notes that the Bankruptcy Code does not define "contingent" and points out, rightly, that, for the term to have meaning, it must have limits. The Fund argues that every future event and right to payment is to some extent contingent on some preconfirmation state of affairs, but not every postconfirmation right to payment was, prior to confirmation, a contingent claim. The Fund argues that, to be a contingent claim, a postconfirmation right to payment must have some significant root in the preconfirmation past.

■■■ The Court agrees. The expansive definition of claim and its legislative history "surely points us in a direction, but provides little indication of how far we should travel." *In re Chateaugay Corp.,* 944 F.2d 997, at 1003 (2d Cir.1991). After all, a contingent right to payment is, by definition, a right to payment that, because it is contingent, is not yet and may never be a right to payment. In the strangely appropriate language of philosopher Martin Heidegger, it might be said to exist somewhere on a continuum between being and nonbeing. At some point on that continuum, a right to payment becomes so contingent that it cannot fairly be deemed a right to payment at all.

Courts have attempted to define that point. For claims arising out of contracts,

claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

*In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.,* 646 F.2d 193 (5th Cir.1981); *Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.),* 58 F.3d 1573, 1576–1577. For tort and statutory environmental claims, courts have employed, most notably, the conduct and the prepetition relationship tests. *See Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.),* 58 F.3d 1573, 1576–1577 (11th Cir. 1995) and cases cited. Under the former, a contingent claim arises upon occurrence of the conduct giving rise to the claim, even if the injury itself occurs later. *Id.,* citing *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 200–201 (4th Cir.1988). The latter holds that a claim arises upon the creation of a "prepetition relationship," such as by contact, exposure, impact, privity, or some other circumstance. *Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.),* 58 F.3d at 1577. One version of this requires—correctly, I believe—a relationship of such degree that the claim could fairly have been contemplated by the parties prepetition. *California Department of Health Services v. Jensen (In re Jensen),* 995 F.2d 925, 930–931 (9th Cir.1993); *In re National Gypsum Co.,* 139 B.R. 397, 406–408 (N.D.Tex.1992).

The claim at issue is a hybrid, both contractual and statutory. It is rooted in the

Debtor's and its predecessor's contractual promises of pension benefits to their employees. But ERISA and the MPPAA regulate and specify how an employer shall meet its contractual obligations to provide pension benefits. They require that the Debtor make contributions to the Fund, including, upon withdrawal, one in the form of withdrawal liability, as defined under the MPPAA.

It makes little difference whether the withdrawal liability is viewed as contractual or statutory. Either way, the Court must determine first what event or series of events "triggers" this liability and then whether the occurrence of that event either was or could fairly have been contemplated by the parties before confirmation of the plan.

█ The Supreme Court has explained at length the nature, purpose, and legislative history of the MPPAA's withdrawal liability, so this Court need only summarize.[5] ERISA was designed to ensure that employees (and their beneficiaries) would not, upon retirement, be deprived of promised pension benefits by termination of pension plans before sufficient funds had been accumulated in them. To that end, "ERISA required employers to make contributions that would produce pension-plan assets sufficient to meet future vested pension liabilities." *Milwaukee Brewery*, 513 U.S. at ——, 115 S.Ct. at 985. With regard to multiemployer plans, these include periodic contributions during the employer's participation in the plan and, as amended by the MPPAA, a payment of "withdrawal liability."

█ By the MPPAA, Congress created withdrawal liability to deter employers from withdrawing from underfunded plans— plans whose assets were insufficient to meet

the vested benefits for which the plan was liable—in order to avoid bearing their share of the cost of keeping the plan afloat.[6] Prior to enactment of the MPPAA, the structure of ERISA actually encouraged employers to withdraw from financially shaky plans. At that time, ERISA imposed liability for the underfunding of an insolvent plan on those employers who remained members of the plan and on those who had withdrawn during the previous five years. An employer that withdrew might or might not have to pay its share of the plan's underfunding, but a remaining employer surely would. "Consequently, a plan's financial troubles could trigger a stampede for the exit-doors, thereby ensuring the plan's demise." *Milwaukee Brewery*, 513 U.S. at ——, 115 S.Ct. at 985. The MPPAA corrected this problem "by changing the strategic considerations." *Id.*

> It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty. That is to say, it imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent).

*Id.* Accordingly, "the Act requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan," consisting of "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *R.A. Gray & Co.*, 467 U.S. at 725, 104 S.Ct. at 2715.

This debt is the employer's withdrawal liability. The rules set forth in the MPPAA for determining withdrawal liability are complex, but the concepts behind them are sim-

---

**5.** See *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720–725, 104 S.Ct. 2709, 2713–2716, 81 L.Ed.2d 601 (1984) (*"R.A. Gray & Co."*); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 213–217, 106 S.Ct. 1018, 1020–1022, 89 L.Ed.2d 166 (1986) (*"Connolly"*); *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 605–613, 124 L.Ed.2d 539, 113 S.Ct. 2264, 2271–2274, 124 L.Ed.2d 539 (1993) (*"Concrete Pipe"*); and *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414,

——, 115 S.Ct. 981, 985–987, 130 L.Ed.2d 932 (1995) (*"Milwaukee Brewery"*).

**6.** Contrary to the Fund's argument, the purpose of the MPPAA was not simply to deter withdrawal and thereby to enhance the financial stability of multi-employer plans. It was intended also to redress the inequity that withdrawal sometimes created among plan participants by enabling an employer to avoid responsibility for its share of the plan's underfunding. It helped to ensure equality of treatment among employers.

ple. First, the rules determine the present value of the vested benefits for which the plan is liable, "benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service." *Concrete Pipe,* 508 U.S. at 609, 113 S.Ct. at 2272. Second, they subtract from this the current value of the plan's assets. *Id.* The difference is the amount of the plan's underfunding. And third, they determine the employer's fair share of the underfunding, "based primarily upon the comparative number of that employer's covered workers in each earlier year and the related level of that employer's contributions." *Milwaukee Brewery,* 513 U.S. at ——, 115 S.Ct. at 986. The calculations are made as of the last day of the year preceding the year in which the employer withdrew. *Id.*

■■■■■ An employer's incurrence of withdrawal liability is thus contingent on many factors. The first is withdrawal itself. Withdrawal liability is triggered by and arises only upon the employer's withdrawal from the plan.[7]

The second is the existence of underfunding at the time of withdrawal, which is contingent on many factors, only one of which is the amount the employer contributed to the plan before withdrawing.[8] The existence of underfunding depends on the value of the plan's assets, which is a function not only of the amount contributed, but also of such other factors as the level of return on the plan's investment of those contributions. Underfunding also depends on the level of the plan's liability for pension benefits, which may vary over time as a result of changes in contractual promises (such as a negotiated increase in benefit levels), in actuarial assumptions (as to employee longevity, for example), and in other factors. Many of the factors cannot be known or quantified

until the employer actually withdraws.[9] Therefore, the amount and even existence of underfunding—and therefore of withdrawal liability—is contingent on the date of withdrawal. *Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 310–311 (5th Cir. 1988) (timing of withdrawal can affect size and existence of withdrawal liability).

■■■■■ However, at least two important factors in the equation were well established before the Debtor filed its Chapter 11 petition. First, employees of the Debtor and of its predecessor in interest held vested claims for pension benefits that the Debtor was bound to honor and for which the Debtor was obligated under ERISA and the MPPAA to make provision. Underfunding is the insufficiency of the plan to honor pension rights that have already vested. And second, ERISA, as amended by the MPPAA, required that all plan participants bear their share of the underfunding burden. Withdrawal liability is only one mechanism by which ERISA ensures this. Employers who remain in the plan will bear a share of the burden, too, but by a different mechanism.

Two further factors were not yet established but nonetheless could fairly have been contemplated by the parties before confirmation of the plan. First, the Debtor and the Plan should fairly have understood that the plan's assets might, by virtue of any number of causes, fall below the level necessary to fund its vested liabilities. This was not a certainty, but—given the duration of these plans, the realities of business and economic cycles, and the unpredictability of many of the important variables—at least a reasonable possibility. And, by operation of ERISA, every plan participant, whether withdrawn or not, would, by one mechanism or another, bear responsibility for its share of this problem. Withdrawal itself is the

---

7. Withdrawal occurs when the employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a); *Concrete Pipe,* 508 U.S. at 610, 113 S.Ct. at 2273.

8. Withdrawal liability is not liability for arrearages on contributions due before withdrawal. Even when, upon an employer's withdrawal, that

employer and every other participating employer has made every contribution that ERISA required of them, the plan may nonetheless be underfunded, resulting in withdrawal liability for the departing employer.

9. Even then, many can be quantified only by sophisticated guessing and estimating; they are variables that will only be settled when history fixes them.

event that triggers the assessment of withdrawal liability, but it is the employer's prior participation in the plan that, through ERISA, "triggers" or imposes on that employer, by one mechanism or another, the obligation to shoulder its share of the plan's underfunding liability. And the existence of such liability was, upon plan confirmation, a reasonable possibility that the parties could and should fairly have anticipated.

Second, to the extent that the triggering event here is withdrawal from the plan, it too could fairly have been anticipated at the time of confirmation. One can assume that sooner or later, every participating employer will withdraw. Withdrawal is sufficiently probable—if not philosophically certain—that it could fairly have been contemplated by the parties. Only the *date* of withdrawal was indefinite. Some employers will continue in business for the long term. However, among debtors reorganizing under Chapter 11 of the Bankruptcy Code, even their near-term continuation in business is, on the whole, notoriously doubtful and precarious. Not every reorganized Chapter 11 debtor soon fails, but many do; as a class, their prospects are quite uncertain. Among these entities, the possibility of withdrawal in the relatively near term, even among those with no announced intention to withdraw, is sufficiently possible that it should fairly have been contemplated at the time of confirmation, at least absent evidence to the contrary, of which I have none.

On the strength of these factors—that the benefits vested prepetition, that the Debtor was at the time a participant in a multiemployer plan, that ERISA required that all employers (whether withdrawn or not) bear their share of the underfunding liability, and that even relatively near-term withdrawal should fairly have been contemplated at confirmation—the Court holds that the Debtor's withdrawal liability was a claim when the Debtor's plan was confirmed. Almost all cases that have addressed this issue have reached the same result.[10] These factors give the claim significant roots in the preconfirmation period. Of course, the claim could have been allowed and quantified only by estimation, but the Bankruptcy Code makes provision for the estimation of contingent and unliquidated claims.[11] 11 U.S.C. § 502(c)(1). And "the holder of a contingent claim incorrectly estimated at the time of allowance may request reconsideration and the court 'may

---

**10.** See *Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir.1986) (although Chapter 11 debtor withdrew from multiemployer plan while in Chapter 11, its withdrawal liability was not an administrative expense because liability is based on contributions made by employer debtor before withdrawing, and because the consideration for this liability was the work performed by covered employees in the years before the bankruptcy filing); *In re Chateaugay Corp.*, 130 B.R. 690 (S.D.N.Y.1991) (same); *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 336–340 (E.D.Pa.1988) (where employer had not withdrawn from multiemployer plan, its withdrawal liability nonetheless constituted liability on a claim for purposes of determining insolvency in a preference action under § 547(b) of the Bankruptcy Code); *In re Great Northeastern Lumber & Millwork Corporation*, 64 B.R. 426 (Bankr.E.D.Pa.1986) (as compensation for prepetition labor, withdrawal liability of employer who withdrew while in Chapter 11 proceeding was not an administrative expense); *In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 504–508 (Bankr.M.D.Tenn.1986) (where participant in multiemployer plan withdrew while in Chapter 11, the plan's claim for withdrawal liability was deemed to have arisen prepetition to the extent that it was based on pension liability that accrued prepetition); *In re Silver Wheel Freightlines, Inc.*, 57 B.R. 476 (Bankr.D.Or.

1985) (despite postpetition withdrawal, Chapter 11 debtor's withdrawal liability was prepetition claim, not administrative expense); *Amalgamated Insurance Fund v. Kessler*, 55 B.R. 735, 738–740 (S.D.N.Y.1985) (as belated compensation for services provided prepetition, withdrawal liability of employer who withdrew while in Chapter 11 proceeding was not an administrative expense); *Matter of Cott Corp.*, 47 B.R. 487 (Bankr.D.Conn.1984) (although debtor withdrew from multiemployer pension plan only postpetition, the portion of its withdrawal liability that was attributable to prepetition service was deemed to have accrued prepetition and therefore was not an administrative expense claim); contra, *Matter of United Merchants and Manufacturers, Inc.*, 166 B.R. 234, 238–242 (Bankr.D.Del.1994) (before withdrawal, pension fund had no claim for withdrawal liability; withdrawal creates the relationship that gives rise to the asserted right to payment).

**11.** Moreover, the necessity of estimation does no particular disservice to this claim. Withdrawal liability, more than most other types of claims, is by nature a claim of estimation. As discussed above, it represents an attempt to close an anticipated but uncertain future deficit.

increase or decrease the amount of [the] prior allowance ... or enter any other appropriate order.' Fed.R.Bankr.P. 3008 advisory committee's note (1983)." *Hemingway, supra*, at 8 n. 8; 11 U.S.C. § 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case.").

For these reasons, the Court holds that the Debtor's withdrawal liability was a "claim" within the meaning of 11 U.S.C. § 101(5) of the Bankruptcy Code when the Debtor commenced its Chapter 11 case and obtained confirmation of its plan. Accordingly, the claim has been discharged and may no longer be enforced. 11 U.S.C. § 524(a)(2).

■ Condyne asks that the Court enjoin the Fund from taking any further action to collect on its discharged preconfirmation claim, but an injunction would be superfluous. The Code itself already enjoins such action. *Id.* And paragraph 6 of the Confirmation Order expressly enjoins all creditors whose debts were discharged by the Plan from "instituting or continuing any action or employing any process to collect such debts or pursue such interests as liabilities or obligations of the Debtor, or any successor to the Debtor." Confirmation Order, ¶ 6. This order applies to the Fund and enjoins enforcement of its claim for withdrawal liability against Condyne.

■ Condyne also asks that the Court adjudge the Fund in contempt of the Confirmation Order and award Condyne the actual damages it incurred in defending against the Fund's contemptuous actions, including reasonable attorney's fees. The Court agrees that, having made demand on Condyne for payment of the withdrawal liability, the Fund has violated the Confirmation Order. However, until now, the Fund has maintained that its claim had not been affected by the Chapter 11 proceeding and was not discharged by the Confirmation Order. Though I have concluded otherwise, this position was

not unreasonable. There is precedent for its position, *Matter of United Merchants and Manufacturers, Inc.*, 166 B.R. 234, 238–242 (Bankr.D.Del.1994) (before withdrawal, pension fund had no claim for withdrawal liability; withdrawal creates the relationship that gives rise to the asserted right to payment), and no controlling precedent on the issue in this Circuit. Moreover, as the Debtor's successor in interest, Condyne stands in the Debtor's shoes; and the Debtor itself, though obligated to list this liability in the schedules it filed in its bankruptcy case, 11 U.S.C. § 521(1), failed to list the withdrawal liability, even as disputed or contingent; and consequently it made no provision for this liability in its plan of reorganization. Had the Debtor listed this claim, the issue presented by this motion would likely have been determined before or in conjunction with confirmation of the Debtor's Plan, as would have been more appropriate. Then or now, the Fund was entitled to a judicial determination of whether the Debtor's withdrawal liability was a "claim" that, as such, was subject to the Debtor's plan and, consequently, discharged by the order of confirmation. I have no evidence that the Fund has done anything more than make demand and obtain a resolution of this threshold issue.[12] Therefore, Condyne's request for damages will be denied.

A separate order will enter declaring that the Fund's claim for withdrawal liability against the Debtor, and against Condyne as the Debtor's successor in interest,[13] has been discharged and is subject to the discharge injunctions set forth in 11 U.S.C. § 524(a)(2) and in paragraph 6 of the Confirmation Order, and denying the remainder of the relief requested.

### ORDER ON MOTION OF CONDYNE FREEZERS, INC. TO HOLD PENSION FUND IN CONTEMPT

For the reasons set forth in the separate memorandum of decision issued today, the

---

**12.** The burden was on Condyne to prove the extent of the Fund's contempt.

**13.** The order will not pertain to any withdrawal liability that Condyne incurred other than as successor in interest to the Debtor. Nor does it

affect any liability that the Debtor's predecessor in interest, Connecticut Cold Storage, may have to the Fund. Such liability is not at issue in this motion.

Motion of Condyne Freezers, Inc. to Hold the New England Teamsters and Trucking Industry Pension Fund in Contempt of the Discharge Provisions in this Court's "Order Confirming Fifth Amended Plan of Reorganization (Freezer Business and Related Real Estate)" is hereby allowed in part and denied in part as follows:

1. The Court hereby ORDERS and DECLARES that the Pension Fund's claim for withdrawal liability against the Debtor, and against Condyne Freezers, Inc., as the Debtor's successor in interest, has been discharged and is subject to the discharge injunctions set forth in 11 U.S.C. § 524(a)(2) and in paragraph 6 of the Confirmation Order;[1] and

2. To the extent that the motion seeks an adjudication that the Fund is in contempt of the confirmation order, and an award of damages on account of such contempt, the motion is DENIED.

---

1. This order does not pertain to any withdrawal liability that the movant has incurred other than as successor in interest to the Debtor. Nor does it affect any liability that the Debtor's predecessor in interest, Connecticut Cold Storage, may have to the Fund.